# Wytheville.

## SOUTHERN RAILWAY COMPANY v. LIMA WOOD AND COAL COMPANY, INCORPORATED.

June 18, 1931.

Present, Prentis, C. J., and Campbell, Holt, Epes and Hudgins, JJ.

The opinion states the case.

*Harris, Harvey & Brown,* and *Thomas B. Gay,* for the plaintiff in error.

*Meade & Meade,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

The Lima Wood and Coal Company instituted an action of unlawful entry against the Southern Railway Company. Both parties waived a jury and submitted all questions of law and fact to the trial judge, who entered judgment for the plaintiff. From this judgment the defendant obtained a writ of error. The plaintiff sought to recover possession of a small

strip of land on the ground that it was in peaceful possession thereof and the defendant by forcible entry dispossessed it. The fact that the plaintiff was in possession is not disputed. The defendant denies forcible entry, claims to be the legal owner, and introduces evidence tending to prove this. The court held that it was not necessary to pass on the title to the property, and that the only issue to be decided was the nature of the entry. In deciding this issue the trial judge, the Hon. Henry C. Leigh, in his written opinion, said:

"I think that the defendant's entry was forcible. That being true, its title is immaterial.

"The facts of this case may be fairly, although briefly, stated to be as follows:

"Plaintiff had been in possession of the strip of ground in dispute for some time, possibly as much as eighteen months. It was enclosed by a wire fence. This fence had been erected for many years—more than fifteen.

"Defendant desired to build a spur track into a cold storage plant which lies immediately to the north of plaintiff's property, and in doing so proposed to make use of a strip of ground about nine and one-half feet wide lying along the westerly side of plaintiff's lot and within the fence. Defendant claimed this strip as a part of its right-of-way. On September 19, 1929, it advised plaintiff by letter of its claim and of its intention to construct the spur track over said strip and to remove and relocate the fence on what it contended was the proper dividing line between its right-of-way and plaintiff's land. To this letter plaintiff replied by letter on September 21, 1929, claiming the strip as its own, and forbidding entry thereon and the removal of the fence. No further communications, verbal or written, were had between the parties. On September 24, 1929, at about 9 A. M., a force of workmen, consisting of six hands and a foreman, went on the ground under instructions from one in authority, equipped with the necessary tools and

implements, and began to take down the fence and rebuild it on what the railway company claimed was the dividing line.

"At about the time this work was begun an employee of plaintiff protested its continuance, but apparently in no very vigorous manner. He made no attempt to drive the workmen off, nor did he offer any resistance. At about this time the general manager of plaintiff company came upon the premises of plaintiff, and upon being advised by his employee as to what was being done, went to the scene and forbade defendant's servants to proceed further with the work. He made no physical resistance, nor did he threaten the workmen with violence. Neither did defendant's servants use any physical violence against his person, nor threaten him, but calmly proceeded to remove and re-locate the fence. Plaintiff's general manager immediately left its premises, went to the courthouse in the city of Danville and swore out a warrant for trespass against defendant's local agent, who was not in charge of the work, but who happened to be near the place it was being done, and who had written and signed the letter of September 19th.

"Defendant's testimony shows that it had determined to remove the fence and build the spur track; that its servants were sent on the ground to accomplish this object, and that this course of action had been definitely determined upon after due deliberation and after receiving notice of plaintiff's protest and objection.

"Was this a forcible entry? There was no violence, but I think that defendant's actions tended to a breach of the peace. Its actions, to my mind, evinced a determination to proceed at all costs, and reasonably justified the apprehension on the part of plaintiff's agents that resistance would be unavailing.

"Under the ancient law of England, the rightful owner of land could take what was his and reckon not the consequences. He could evict the one in possession and use force in doing so. Indeed, one without the right of possession could disseize the rightful owner and pass a *prima facie* title to a purchaser by

feoffment with livery of seizin, and this title could only be defeated by the disseisee through protracted and expensive litigation. Now, this situation grew out of the peculiarities of feudal tenure, and it is not strange that under such a system, when title and possession were in fact more nearly the same thing than at present, the law should have allowed a greater latitude for the recovery of one's own than it should at this date, when ample and reasonably speedy remedies are afforded. And again when descent tolled entry, or the right of entry, it was, no doubt, as a practical matter, important that the owner should act quickly and, if necessary, with force.

"In the reign of Richard II parliament abrogated the right to so recover property by the enactment of the first unlawful entry statute recorded in English-speaking countries. Statutes of similar general import are in force in many, if not all, of the States, and such a statute has been in effect in Virginia since 1789. The object of the legislation was to prevent breaches of the peace and bloodshed. In many cases, the person in possession, although in fact without the title, may entertain the *bona fide* belief that through adverse possession, or otherwise, he owns the land. If the real owner of the title were allowed to be his own judge and to enforce his own judgment by force, the usual result would be an affray of the most serious kind, for man instinctively defends what he possesses, as well as what he owns. With the end in view of preventing violence and disturbances, the law has said, even to the owner, that you may not take what is yours by force, and if you do, what you have taken shall be returned to him from whom you took it. The underlying thought of the lawmakers being to discourage unlawful entries by letting it be known that no advantage would accrue therefrom; that the *status quo ante* would be restored, in order that the rights of the parties might be determined in an orderly manner and according to such means and methods as the law prescribes and provides.

"Now, it is difficult to arrive at a satisfactory conclusion as

to what constitutes a forcible entry. At one time the Virginia statute provided that the entry be not made with 'strong hand or with a multitude of people.' Revised Code of 1819, ch. 115. "Strong hand meant more under the old decisions than a show of force; more than an entry with forces sufficient to overcome resistance. Violence must have been committed or threatened. The possessor must have stood his ground; he must have been physically removed or coerced into removing himself by threats inducing fear. But was the alternative phrase, 'or with a multitude of people,' written into the statute to provide for a situation or for acts not coming within the definition of an entry with strong hand, but for one which was thought should be remedied? It seems to me that when due regard to the purposes and objects of the legislation is had that this must be so. Certainly, if a law is enacted which has for its object the prevention of breaches of the peace, it is a futile thing, if in order to obtain the benefits of the law, a person must himself provoke a breach of the peace. Is it a condition precedent to the successful maintenance of a warrant of unlawful entry and detainer that the plaintiff must embroil himself with those who enter upon his possession? I think that the answer is that if the actions of the entrant are such as to necessitate a breach of the peace, or make it reasonably appear necessary that there must be a breach of the peace by the possessor in order to maintain his possession, then the entry is forcible within the purview of the statute when construed in the light of present day conditions and existing remedies. 26 C. J. 824.

"There appear to be no authorities in Virginia elaborating the point involved, and I am, therefore, constrained to follow those authorities which appear to me to be more consonant with good reasoning and more nearly tend to accomplish the desired results.

"Must the possessor in order to be entitled to his remedy—and the law contemplates a remedy for him and has under-

taken to provide it—stand his ground so firmly that he invites assault? Must he himself resist a threatened invasion by force of arms, either real or feigned? Shall he plant his feet upon the soil which he occupies and there await the removal of his person by those who come upon it against his protests? I cannot think that upon principle these questions can be answered affirmatively. Upon precedents—old precedents—perhaps they could be. To do so, however, is to say in effect to the person in possession that he must pay a price which the law, if it is to accomplish what it set out to do, says shall not be paid, namely, to engage in a personal altercation with the intruders.

"The entry must be accomplished by actual force, or by such a show of force that the yielding without a struggle cannot be deemed a consent to being deprived of possession. Note to *Wilson* v. *Campbell*, 121 Am. St. Rep. p. 391.

"There is no necessity that the force offered, or intended to be offered, if necessary, should be resisted, if the failure to resist it is due to intimidation or well founded belief that the resistance will be useless. *Wilson* v. *Campbell, supra,* p. 398.

"An entry upon land in the possession of another by one with such a show of force as to make it useless for the occupant to try to maintain his possession, is a forcible entry. *Lissner* v. *State,* 84 Ga. 669, 11 S. E. 500, 20 Am. St. Rep. 389.

"To constitute the offense of forcible entry there must be either actual violence used, or such demonstration of force as is calculated to intimidate or alarm, or as involves or tends to a breach of the peace. *State* v. *Mills,* 104 N. C. 905, 10 S. E. 676, 17 Am. St. Rep. p. 706.

"It is sufficient if there is such demonstration of force as to create a reasonable apprehension that the party in possession must yield to avoid a breach of the peace. *State* v. *Lawson,* 123 N. C. 740, 31 S. E. 667, 68 Am. St. Rep. p. 844.

"Defendant invaded premises in the possession of plaintiff with 'a multitude of people.' To my mind, it was to be reasonably apprehended by plaintiff's general manager that

resistance would be futile and would have provoked a breach of the peace. Certainly he had no power to drive the invaders off without resorting to physical violence, and any effective physical violence must have been with fire arms. In view of the expressed determination by defendant to come on the premises, followed by its action in doing so, I think that plaintiff's agent could only reasonably have thought that there was nothing he could do. To my mind, the law intends, certainly in view of the more peaceable inclinations and customs prevailing at this time, to afford one in possession and who is deprived thereof under such circumstances, protection. Judgment will be granted for the plaintiff."

We think his analysis of the facts and conclusions therefrom are clearly right, and the judgment is affirmed.

*Affirmed.*