# Richmond

## Town of Grundy v. Trula Goff.

June 19, 1950.

Record No. 3666.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Pobst & Coleman*, for the plaintiff in error.

*S. H. & Geo. C. Sutherland* and *W. A. Daugherty*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This is an action of unlawful entry and detainer instituted by Mrs. Trula Goff against the Town of Grundy to recover from the defendant the possession of a small strip of land on the eastern side of Main street within the corporate limits of the said town. Virginia Code, 1942

(Michie), section 5445, Code of 1950, Title 8, section 789-791. Mrs. Goff claimed that while in the actual, peaceful and exclusive possession of the land, she was forcibly ousted by the town within three years prior to the institution of this suit. The Town of Grundy contended that it owned the land as a part of what is known as "Back Street" or "Back Alley" of the town, and that it had been used by the public as a street or highway for more than fifty years. The case was tried before a jury, which after hearing the evidence, the instructions of the court, and viewing the premises, returned a verdict for the plaintiff, Mrs. Goff. The motion of the defendant to set aside the verdict as contrary to the law and the evidence and without evidence to support it, and for error in the granting and refusing of instructions, was overruled by the court. Judgment was entered in accordance with the verdict.

The assignments of error before us relate solely to the sufficiency of the evidence to sustain the verdict. No questions are raised as to the instructions to the jury. There is no dispute as to the law involved, but rather as to the application of the law to the evidence.

■ Faced by a verdict in favor of the plaintiff, approved by the trial court, the plaintiff is entitled to have the evidence stated in the light most favorable to her. She is entitled to all just inferences deducible therefrom.

A plat and a brief history of the land involved and adjacent lands may be helpful in consideration of the evidence. The following plat made by C. B. Belcher, a mining and surveying engineer, was filed as an exhibit:

PLAT SHOWING 18' STREET AS
CLAIMED BY, MRS. TRULA COFF
GRUNDY, BUCHANAN COUNTY, VIRGINIA,
C. B. BELCHER, ENG.      SCALE 1" = 20'

On the plat the land in controversy is a strip about 5 feet wide fronting on Main street and running back therefrom 52.8 feet, lying adjacent to the north line of the lot shown as "Taxi Stand." The question involved is the correct location of the southern line of the alley, that is, the line between the alley and the "Taxi Stand" lot.

No survey or map of the town showing the public streets and alleys therein was filed, nor was there evidence that such a plat had been made and approved by the council

of the town. Code of 1950, section 15-765, formerly Code of Virginia, 1942 (Michie), section 2977.

No record of the board of supervisors of the county of Buchanan, in which Grundy is located, showing the dedication and acceptance of the disputed land as a public highway, was produced. The first recorded reference to the alley appears in a deed dated August 10, 1905, from R. E. Williams and wife conveying to W. L. Dennis a lot in the Town of Grundy fronting 87.5 feet on the east side of Main street and running back therefrom between parallel lines 52.8 feet. This lot was bounded on the north by Slate Creek, its northeastern and northwestern corners being marked by stakes in said creek. This deed contained the following language: "There is, however, excepted from the operation of this deed and not hereby conveyed the public alley running parallel with and near Slate Creek."

By deed dated May 24, 1924, W. L. Dennis and wife conveyed the same lot, with the same exception as to alley, to M. L. Goff. At the time of this deed a wooden store building stood upon the southern portion of the land conveyed, that is, south of the alley.

The wooden building and the land upon which it stood was rented by W. L. Dennis to V. C. Smith in 1916. About a year later, Smith, after obtaining the consent of Dennis, built a small addition about 6 or 8 feet wide on the northern side of the building for use as a soda fountain shop. Smith continued to use the building, with the addition thereon, until it was destroyed by fire in April, 1940.

In 1936, M. L. Goff erected a brick store building, called the "Wigwam" on the plat, on the northern portion of the lot obtained from Dennis, leaving a space of 18 feet between that building and his wooden building on the southern portion of the lot. The space between the two buildings had been and was, at that time, used for travel as a passway or alley running nearly parallel with Slate Creek a distance of about 300 feet easterly from Main street. At the time

of these proceedings, the eastern portion of the alley had been closed for many years.

On August 25, 1938, M. L. Goff and wife conveyed to Mrs. I. S. Ratliff, for a stated consideration of $8,500, a parcel of land described as fronting 26 feet on Main street, being the southerly portion of his 87.5 foot lot fronting on that street, described as being bounded on its north by a division line between it and an alley, the line being marked at its easterly and westerly ends by stakes placed on the edge of the alley.

On February 13, 1943, Mrs. I. S. Ratliff and husband reconveyed to M. L. Goff, for one dollar and other considerations, the above lot under the same description.

M. L. Goff died May 17, 1944, leaving a will in which he devised and bequeathed unto his wife, Trula Goff, "during her natural life, or so long as she remains my widow, for the benefit of herself and our children, all the rents, royalties and profits from all of my real estate wheresoever situated or located, with all the rights and remedies for the collection of same."

A. M. Ratliff, the husband of Mrs. I. S. Ratliff, testified that no money passed in the exchange of deeds between M. L. Goff and Mrs. Ratliff. The wooden building and its addition made by Smith then covered the strip of land in controversy. Ratliff said that Goff couldn't talk; that Goff having heard the town was considering the condemnation of a part of his lot, made the deed because he thought that Ratliff could defend its condemnation better than he could, and, therefore, he set a price for the property as something to go by in the event of such a proceeding. During the period the title was in his wife, Ratliff collected the rents, paid the taxes, remitted the balance to Goff, and made no charge for his services. When the Ratliffs moved from the vicinity, the lot was reconveyed to Goff.

After the wooden building was destroyed by fire in 1940, the land was leased, with the consent of Goff, to L. E. Mann for a taxi stand. The debris caused by the fire was

removed and the lessee entered in possession of the premises and continued there until 1945.

After Mann's tenancy terminated, Mrs. Goff leased the same premises November 7, 1945, to Bill Goodman. Goodman put up a building ten by fourteen feet on the lot for use as an office and a waiting room for customers in his taxi-cab business. He had fourteen cars and parked nine of them on the lot. Goodman said he asked Mrs. Goff to put up fence posts so he could stay inside of the lines of the leased property, and that he used all of the property that was beyond 18 feet from the "Wigwam" building.

Mrs. Goff testified that she twice had the land in question surveyed and on each occasion stakes had been placed along the northern boundary of the "Taxi Stand" lot. After the surveyor's stakes, placed on the boundary line in the second survey, had been removed or destroyed, she caused to be placed on the same line two locust poles about 3 inches in diameter and about 3 or 4 feet high. She said these stakes correctly marked the division lines between her property and the alley, and that she and her tenants had used all of the lot south of the alley continuously, peacefully, and exclusively until July, 1946.

C. B. Belcher, the surveyor, identified the plat made by him. He surveyed the disputed land twice, about six months apart, the last survey being about six months after the bus terminal began operations. He said that in each instance he placed small stakes in the ground on a line 18 feet from the "Wigwam" building designating the southern boundary line of the alley; that six months after his last survey, he could not find these stakes and he then placed other stakes along the same line by erecting locust poles in holes dug 3 feet in the ground. In his survey there was uncovered a wall "laid up out of rock" running parallel with the alley 20.6 feet from the northern line of the bus terminal lot. He did not know why this wall had been placed there.

It appears that a concrete sidewalk had been constructed many years ago in front of the wooden building on the eastern side of Main street. This sidewalk ended at a point on the line which the plaintiff claimed was the southern boundary of the alley. It was in front of the land claimed by the town.

After M. L. Goff constructed the brick building to the north of the alley, some one put in a boardwalk 4 feet in width next to that building. This reduced the width of the alley for vehicular travel between the brick building and the land upon which the wooden store building formerly stood from 18 to 14 feet. The wood sidewalk was connected with a concrete sidewalk, 4 feet wide and 2 or 3 feet higher than the alley, which continued easterly along the alley.

There was evidence that the width of the alley had been infomally discussed at meetings of the town council about 1939, and thereafter. The city attorney had been consulted, and apparently had advised that the town was entitled to the strip of land in question.

In July, 1946, Hassell Goff, son of Mrs. Goff, visited the premises. He found that one of the locust posts placed by his mother had been partly broken and pulled up. He there saw the Mayor of Grundy, Mr. McClanahan, together with several other persons, including the chief of police of the town and the town's attorney. He observed the Mayor pulling up the other stake, and immediately requested the latter to refrain from removing the post. He expressed a purpose to take legal action to prevent its removal. The Mayor replied that he was acting under the advice of the town attorney, and the town attorney instructed the Mayor to proceed. Notwithstanding Goff's continued protest, the stake was pulled up by the town officials, and they directed a construction company to proceed with surfacing the alley. When Goff returned at seven o'clock p. m. of the same day, he found all of the stakes

had been removed and the alley, including the strip in controversy, surfaced with a covering of asphalt.

Mayor McClanahan admitted that he removed the posts under instructions of the town attorney, and that he told Hassell Goff if there was any further dispute, the latter could have a court settle it.

On the part of the defendant there was some evidence that persons visiting the town had used a part of the strip in controversy as a hitching rack for their horses before the erection of the addition to the wooden building hereinbefore mentioned. With reference to its acquisition of a right of way for an alley prior to the date of the deed from Williams to Dennis in 1905, the town, in its brief, says: "Whether this land had been acquired by written dedication and acceptance, or by mere user and acceptance by the public for more than twenty years, was unknown." There is no written evidence of the dedication and acceptance by the town of the alley under any description, either by metes and bounds or otherwise, since 1905.

A number of elderly witnesses gave some vague and confused evidence of the extent of the user of the disputed land and the location of the boundary lines. No one of them was able to state the exact width of the alley. Evidence of its user and improvement did not point to any definite portion. In addition to the wall of rough rock uncovered by Belcher, the surveyor, there was evidence of another rock wall to the north and closer to Slate Creek. It was suggested that these were retaining walls for the benefit of the land sloping towards the creek.

The town conceded, during the hearing, that it was unable to show the exact location of the alley. Its counsel, when asked: "Where do you claim the line was over next to the creek?" replied, "Over next to Slate Creek, there never was any line so far as we know, there was nothing there to show, it was a creek bank. In other words, we don't know whether M. L. Goff put the Wigwam building on the line or not."

Traffic rapidly increased in the Town of Grundy about 1940, due to the increased use of the automobile and improved economic conditions. About that time the bus terminal adjoining the "Taxi Stand" lot was constructed. A number of bus lines operated in and out of Grundy using this terminal. The buses proceeded through the alley in question and entered the terminal from the rear or east side. Some of them were of such size that they found difficulty in operating over the alley.

No positive action was taken towards locating the disputed boundary line until the above difficulties became apparent.

It appears that shortly after the wooden building was burned in 1940, the Appalachian Electric & Power Company, with the consent of the town, placed a light and service pole on the controverted strip just north of the rock wall shown on the plat and near the sidewalk.

The jury were given numerous instructions relating to the requisites for successfully maintaining or defending an action of unlawful entry and detainer. The instructions covered every phase of the respective theories of the parties, and, as we have stated, no error is here assigned to them. In one of the instructions the jury were told that:

"The court instructs the jury that the issue in this case. is the right of the parties to the possession of the strip of land in controversy.

"(1) The plaintiff is entitled to the possession of this land if the evidence satisfies you by a preponderance thereof that she has the title to the said strip of land;

"(2) That irrespective of whether or not the plaintiff has shown title, if you believe that she had the possession of said land in the summer of 1946, and that the defendant forcibly took said possession from her, then she is entitled to recover this possession back and in this connection you are further instructed that if you believe that the officials of the town, including its Mayor and Chief of Police, in taking possession, gave the son and agent of the plaintiff reasonable grounds to believe, and he did believe that any

resistance at the time without resort to the court, would be useless, then this was a forcible entry;

"(3) If you believe by a preponderance of the evidence that the plaintiff, in the summer of 1946, when the defendant was improving this back street or alley, had the peaceable possession of this lot of land, and that such possession extended out to where she had placed the locust posts, then any entry on the same by the defendant is unlawful, and the plaintiff is entitled to the possession of said lot, unless the defendant has shown by a preponderance of the evidence that it has title to the said strip of land."

In the trial court, the sole objection to this instruction was that there was no evidence to support the latter portion of paragraph No. 2. With this we cannot agree.

In Virginia, we have repeatedly held that the design of the action of unlawful entry and detainer is "to protect the actual possession, whether rightful or wrongful, against unlawful invasion, and to afford summary redress and restitution. The entry of the owner is unlawful if forcible, and the entry of any other person unlawful, whether forcible or not." Judgment only restores the *status quo* of the parties, and settles nothing as to the title or right of possession. *Olinger* v. *Shepherd*, 12 Gratt. (53 Va.) 462; *Davis* v. *Mayo*, 82 Va. 97; *Southern Ry. Co.* v. *Lima Wood, etc., Co.*, 156 Va. 829, 159 S. E. 69; 8 M. J., Forcible Entry and Detainer, section 6, and cases cited.

See also, *Shorter* v. *Shelton*, 183 Va. 819, 33 S. E. (2d) 643.

It cannot well be questioned that the Goffs and their tenants were in actual possession of the disputed land from 1924 to 1940. During that period it was covered by a building occupied by a tenant, and it could not have been used by the public as a passage way. Subsequent to 1940, the evidence sufficiently supports the finding of the jury that the Goffs were in actual possession until July, 1946, when the town entered upon the premises and ousted Mrs. Goff from possession.

This brings us to the question whether the entry of the town was forcible or not. On this question the case of *Southern Ry. Co.* v. *Lima Wood, etc., Co., supra,* is directly in point both as to the facts and the law. There an action of unlawful entry was brought against the railway company. The possession of the plaintiff was not denied. After a dispute about a boundary line, a foreman and six men of the defendant went on the grounds of the plaintiff with tools to remove a fence. The plaintiff forbade them to proceed with that work. He made no physical resistance nor did he threaten the workmen with violence, neither did defendant's servants use any physical violence against plaintiff's person, nor threaten him; but calmly proceeded to remove and relocate the fence. The plaintiff left the premises and obtained a warrant of trespass against the defendant's agent.

In that case, the court approved the written opinion of the trial judge, in which he discussed what constituted a forcible entry, cited authority, and made the following statements (156 Va. 834, *et seq.*):

"If the actions of the entrant are such as to necessitate a breach of the peace, or make it reasonably appear necessary that there must be a breach of the peace by the possessor in order to maintain his possession, then the entry is forcible within the purview of the statute when construed in the light of present day conditions and existing remedies. * * *

"Must the possessor in order to be entitled to his remedy —and the law contemplates a remedy for him and has undertaken to provide it—stand his ground so firmly that he invites assault? Must he himself resist a threatened invasion by force of arms, either real or feigned? Shall he plant his feet upon the soil which he occupies and there await the removal of his person by those who come upon it against his protests? I cannot think that upon principle these questions can be answered affirmatively. Upon precedents—old precedents—perhaps they could be. To do so,

however, is to say in effect to the person in possession that he must pay a price which the law, if it is to accomplish what it set out to do, says shall not be paid, namely, to engage in a personal altercation with the intruders."

In 22 Am. Jur., Forcible Entry and Detainer, section 2, this is said:

"A forcible entry, except where the meaning of the term has been changed by statute, is an entry on real property peaceably in the possession of another, against his will, without authority of law, by actual force, or with such an array of force and apparent intent to employ it for the purpose of overcoming resistance that the occupant in yielding and permitting possession to be taken from him must be regarded as acting from a well-founded apprehension that his resistance would be perilous or unavailing."

See also sections 28, 29, and 30 in 22 Am. Jur., *supra*, and 36 C. J. S., Forcible Entry and Detainer, section 18.

In the present case, the actual peaceful and exclusive possession of the plaintiff has been settled by the jury's verdict. Here, after some informal discussion of a boundary line, the mayor, the town attorney, and the chief of police of the town went on the grounds of the plaintiff, prepared and determined to remove a post or posts so as to take possession of the land beyond the post. They were not acting under legal writ but as representatives of the town under the color of their offices. Plaintiff's agent forbade them to remove the posts or proceed with their work. He made no physical resistance nor threats of violence. Neither did the town officials use any physical violence against plaintiff's agent, nor threaten him by words; but they calmly proceeded to remove the posts and cover the land with asphalt surfacing. The plaintiff subsequently instituted this proceeding within three years.

Here, as in the former case, the defendant used no physical violence; but its agent evinced a determination to proceed at all costs. Its officers invaded the premises of the plaintiff, actually began the removal of a post on land claimed

by her, and refused to desist when requested to stop, all without legal writ or warrant. She was told that if she had any remedy she must seek it in court.

The invasion was with such a display of force as to manifest an intention to intimidate the plaintiff. It had a tendency to indicate that resistance would be useless and constitute a breach of the peace. The language and acts of the officers of the town and the nature of their official positions could well have justified a reasonable apprehension on the part of the plaintiff's agent that there was nothing he could do to stop the invasion without resorting to physical violence and subjecting himself to arrest and the physical detention of his person upon the charge of interfering with an officer in the discharge of his duties.

In view of what we have said, there is no necessity to consider whether or not the town held title to the strip of land in controversy. The verdict of the jury, approved by the trial court restores the *status quo* as it existed at the time of the ouster of Mrs. Goff from possession of the land. The evidence is sufficient to sustain the verdict of the jury, and consequently the judgment must be affirmed.

*Affirmed.*