**In re CHEROKEE CORPORATION OF LINDEN, VIRGINIA, INC., Debtor.**

**CHEROKEE CORPORATION OF LINDEN, VIRGINIA, INC., Plaintiff,**

**v.**

**CAPITAL SKIING CORPORATION, Defendant.**

**Bankruptcy No. 96–15445.**
**Adversary No. 97–1002.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

July 1, 1998.

John C. Morgan, Jr., Warrenton, VA, for Debtor.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

Today we consider the counterclaims of Cherokee Corporation of Linden, Virginia, Inc. ("Cherokee") against Capital Skiing Corporation ("Cap Ski") for unlawful detainer, unjust enrichment, tortious interference with prospective business advantage/ tortious and intentional interference with business relationships and punitive damages. This case arises out of nearly six years of litigation both in this court and various state and federal courts concerning ownership of a ski resort and payment of mechanic's liens. The defendant, Cap Ski has filed a proof of claim in the instant case to which the debtor has objected and raised counterclaims. After a hearing was held on September 17, 1997, the court dismissed counterclaims 2, 3 and 7 (constructive trust, negligence and breach of

contract respectively) on the grounds that they were barred by *res judicata*. Similarly, at a hearing on November 18, 1997, this court dismissed counterclaim 5 (statutory and civil conspiracy) also on the grounds of *res judicata*.

A trial was held on December 10, 1997 on the three remaining counterclaims, unlawful detainer, unjust enrichment, tortious interference with prospective business advantage/ tortious and intentional interference with business relationships and punitive damages.

**Prior History**

Cap Ski is a Virginia corporation whose stockholders consist of corporations that were also the four largest mechanic's lienors of the property known as Cherokee Ski Resort. The mechanic's lienors filed suit against Cherokee in the Circuit Court of Warren County to enforce their mechanic's liens. A consent decree was entered on February 5, 1991 granting judgment in favor of the mechanic's lienors. Cherokee defaulted and the mechanic's lienors sought enforcement of the liens under the consent decree.

On June 7, 1991, Cherokee filed its first Chapter 11 proceeding to stop enforcement of the consent decree. On August 15, 1991, two of the mechanic's lienors filed a motion for relief from the stay seeking leave to proceed with enforcement of the consent decree. On the eve of trial, Cherokee settled and entered into a consent order granting relief from stay. According to the bankruptcy consent order, Cherokee agreed to grant the mechanic's lienors a first deed of trust on the property. A note and deed of trust were executed by Cherokee on March 26, 1992 to secure the bankruptcy consent order.

The bankruptcy consent order provided that Cherokee would have a 10 day grace period to make payments before foreclosure proceedings could begin without further order of the Bankruptcy Court. Cherokee failed to make the payment due on March 31, 1992 and the mechanic's lienors requested the Substitute Trustee, James Drown to commence foreclosure.

On July 24, 1992, the mechanic's lienors assigned their interests in the note and deed of trust to Cap Ski. Eventually, after some delay, a foreclosure sale was held on November 30, 1992 and the property was sold to Cap Ski.

On December 11, 1992, Edward Raney filed suit in the Circuit Court of Warren County. Raney sought to establish title of the Cherokee Ski Resort in himself as opposed to Cherokee. Cap Ski filed an action in ejectment also in the Circuit Court of Warren County. The court consolidated the two actions for trial. The case was resolved in favor of Cap Ski, when the trial court determined that Cherokee, not Raney, was the legal owner of the ski resort. The final decree was entered in both cases on November 9, 1993.

On November 30, 1993, Cherokee and Occoquan with others filed an action at law in the Circuit Court of Warren County claiming that the trustee's sale had been improperly conducted and asserting various claims against Cap Ski. The circuit court bifurcated the action into a chancery issue and an action at law.

On January 20, 1995, the circuit court determined that the conveyance to Cap Ski at the foreclosure sale was void and title to the property reverted to Cherokee. However, the court granted the Trustee authority to readvertise and conduct another foreclosure sale if the note holder under the deed of trust was still in default.

A second suit was brought by Cherokee against *inter alia* Cap Ski in federal court on July 6, 1995. The claims included unlawful entry and detainer, unjust enrichment, statutory conspiracy, and tortious interference with a prospective business advantage. This case was dismissed for lack of jurisdiction.

A third suit was then brought by Cap Ski against Cherokee in the Circuit Court of Warren County. On August 7, 1996, the circuit court entered an order granting Cap Ski a judgment against Cherokee in the amount of $2,736,305.39.[1] The court found

---

1.  After a jury trial and the verdict was returned, the court held that "the real estate taxes paid to Fauquier County in the amount of $2,252.04 and

Warren County in the amount of $19,739.10 were paid at a time when Capital Skiing owned the property." August 7, 1996 Order of Warren

Cherokee in default on the deed of trust and granted Cap Ski's motion to move the case to the equity side of the court. J. Daniel Pond II was appointed Special Commissioner for the purpose of selling the property.

On October 4, 1996, Cherokee filed the instant Chapter 11 petition. However, pursuant to the Order from the Warren County Circuit Court, a judicial sale was held on October 5, 1996 by the Special Commissioner. Cap Ski was the successful purchaser at the sale and asserts that it did not become aware of the bankruptcy filing until after the sale had occurred. A motion to annul the stay pursuant to 11 U.S.C. § 362 and to validate the sale was filed by Cap Ski on November 18, 1996. A final determination on the motion has been postponed pending the outcome of this adversary proceeding.

On November 12, 1996, Cap Ski filed a proof of claim. On January 6, 1997, the debtor filed an objection to the proof of claim. In the objection, Cherokee asserted that the amounts owed by Cherokee to Cap Ski were not determined with finality and therefore the proof of claim could not be allowed. Cherokee also filed counterclaims. Thereafter, a Revised Objection to Proof of Claim of Capital Skiing Corporation and Counter–Claims was filed on April 3, 1997. The counterclaims were the basis for the trial on December 10, 1997. The initial counterclaims were (1) unlawful detainer/ ejectment; (2) constructive trust/ breach of fiduciary duty/ knowing participation in a breach of trust; (3) negligence, gross negligence, recklessness; (4) unjust enrichment; (5) statutory conspiracy pursuant to Virginia Code § 18.2–499 and –500/ civil conspiracy; (6) tortious interference with prospective business advantage/ tortious and intentional interference with business relationships; (7) breach of contract/ tortious breach of contract; and (8) punitive damages.

At a hearing on September 17, 1997 this Court dismissed counts 2, 3 and 7 on the grounds that they were barred by *res judi-*

cata. Similarly, at a hearing held on November 18, 1997 this court dismissed count 5 also on the grounds of *res judicata.* The remaining claims are (1) unlawful detainer/ ejectment, (4) unjust enrichment, (6) tortious interference with prospective business advantage/ tortious and intentional interference with business relationships and (8) punitive damages. Additionally, Cherokee claimed at trial that it was alleging a claim of common law conspiracy.[2]

**Findings of Fact**

The property at issue, the Cherokee Ski Resort, is located in Linden, Virginia with access to the property available by two roads, the Lado Road and the CCC Road. The Lado Road runs over two parcels of land. One parcel is owned by Dr. Lado and the other is owned by the Pickrell family. Cherokee never paid Dr. Lado for use of the road. Further, although it had reached a tentative agreement with the Pickrells to use the Lado Road when the ski resort operated for the ski season of 1990–1991, no land was ever conveyed to Cherokee. Additionally, a final agreement was never reached among the parties to provide Cherokee with an easement over the property to allow use of the Lado Road.

After the foreclosure sale was held on November 30, 1992, "no trespassing" signs were posted on the property, with at least one sign in the vicinity of a chain that was strung across the Lado Road to prevent trespassers. A chain was placed across the entrances to the property on both the Lado Road and the CCC Road to prevent access to the property by trespassers. Chains were also placed across the doors of the ski lodge and a padlock was placed on the pump-house doors.

The record establishes that despite the chains and locks, Cherokee and individuals associated with Cherokee, were able to gain access to the property as testified to by many of Cherokee's witnesses. Several people had entered the property on more than one occa-

County Circuit Court in At Law No. 96–000148. The real estate taxes were assessed for the period 1991 through 1993 and paid by Cap Ski on November 30, 1993 and December 13, 1993 respectively.

2. We find that regardless of how Cherokee pleads conspiracy, either statutory, civil or common law, this claim is dismissed on the grounds of *res judicata.*

sion since the foreclosure sale to inspect the property. Mr. Adkins, the debtor's principal, testified that on four or five occasions after the foreclosure, he was able to gain access to the property, including the lodge, to take pictures and evaluate the damage to the property.

Robert Pickrell was employed by Cap Ski to patrol the property and investigate any damage that may occur on the property. Mr. Pickrell testified that from the period of November 30, 1992 through January 20, 1995, there was some damage to the property. The first instance was when he discovered that someone had broken into the basement with the only damage being a broken window. The second instance was that the pump house door was broken by trespassers. Mr. Pickrell testified that nothing was missing from either break-in. After the foreclosure sale was declared void on January 20, 1995, Cap Ski continued to employ Mr. Pickrell to patrol the property in order to protect Cap Ski's interest in the property. Mr. Pickrell did not remove the chain across the Lado Road even after January 20, 1995.

It was established that there was substantial damage to the property at some time after November 30, 1992 but prior to the trial in this case. However, the uncontroverted testimony of Mr. Pickrell is that the majority of the damage occurred after January 20, 1995 with the only damage occurring prior to January 20, 1995 being the broken window in the basement and the broken door to the pump house.

The record also establishes conclusively that the foreclosure sale held on November 30, 1992 was declared void on January 20, 1995. The sale was voided by the Circuit Court of Warren County for the reasons stated in its letter opinion dated January 11, 1995 when an issue arose as to whether Lucy O'Bannon had a claim against the property. The court indicated that the trustee had an obligation to "clear the claim through the courts to assure good title to Cherokee under the deed of trust." The Trustee did not clear up the title or resolve the claim to the property prior to conducting the sale and therefore, the court declared the sale void. The January 20, 1995 decree ordered that title revert to Cherokee and that if Cherokee was still in default on the note to Cap Ski that Cap Ski could conduct another foreclosure sale.

## Conclusions of Law

### 1. *Unlawful Detainer*

Cherokee argues that Cap Ski is liable for the wrongful withholding and destruction of Cherokee's property. Additionally, Cherokee asserts itself as the rightful owner of the property because the foreclosure sale had been adjudicated unlawful by the Circuit Court of Warren County. Cherokee alleges that Cap Ski unlawfully detained the property without its consent or permission. Cherokee also asserts that the decree deemed Cap Ski's possession of the property wrongful and therefore Cap Ski is liable for unlawfully detaining the property. As a consequence of the unlawful detainer, Cherokee argues that it is entitled to an order of ejectment pursuant to Virginia Code § 8.01–131 through § 8.01–178 and damages totaling $7,003,-000.00.

Cap Ski responded by asserting that it had legal title and lawful possession of the property upon the receipt of the trustee's deed from the sale that took place on November 30, 1992. Therefore, Cap Ski claims that it cannot be held responsible for damages during this period. Furthermore, in any event, Cherokee cannot prove that the damages were committed while Cap Ski possessed the property or that the damage was done by a Cap Ski employee or agent. Cap Ski counters that Cherokee's argument that Cap Ski's possession was wrongful or unlawful must also be dismissed. The letter opinion and decree of the state court proceedings found that the sale was void and should be set aside, and the property should revert to Cherokee. However, the court made no determination that Cap Ski's holding of the property was unlawful.

The Virginia Code provides for a judgment after a finding of unlawful entry and detainer. The statute provides:

If any forcible or unlawful entry be made upon lands, or if, when the entry is lawful and peaceable, the tenant shall de-

tain the possession of land after the right has expired, without the consent of him who is entitled to the possession, the party so turned out of possession, no matter what right of title he had thereto, or the party against whom such possession is unlawfully detained may file a motion for judgment ... alleging that the defendant is in possession and unlawfully withholds from the plaintiff the premises in question. Va.Code § 8.01–124.

In order to maintain a cause of action for unlawful detainer, Cherokee must prove that Cap Ski forcibly or unlawfully entered the land, maintained possession of the land without a right to do so, without Cherokee's consent and withheld possession from Cherokee. *Daily v. Rucker*, 151 Va. 72, 77–78, 144 S.E. 466, 467–68 (1928) (stating "[t]he remedy for a forcible or unlawful entry or detainer was designed to protect the actual possession, whether rightful or wrongful.... if the defendant enter unlawfully, the plaintiff is entitled to recover, without any regard to the question of his right to of possession"). The determination as to whether the holding was unlawful does not require a finding that Cap Ski had proper title to the property. *Davis v. Mayo*, 82 Va. 97, 99 (1886). The issue of proper title is separate and independent of a determination of lawful possession in a cause of action for unlawful detainer, *Pannill v. Coles*, 81 Va. 380, 387 (1886), because the purpose of a cause of action for unlawful detainer is to protect the actual possession of the property. *Town of Grundy v. Goff*, 191 Va. 148, 160, 60 S.E.2d 273, 278 (1950). The cause of action requires the court to determine whether the possession is "rightful or wrongful [as] against the unlawful invasion and to afford summary redress and restitution." *Id.* (citing *Southern Ry. Co. v. Lima Wood*, 156 Va. 829, 159 S.E. 69 (1931); *Davis v. Mayo*, 82 Va. 97, 99 (1886); *Olinger v. Shepherd*, 53 Va. 462, 12 Gratt (53 Va.) 462 (1855)).

Case law is unclear on the issue of whether the purchaser of property at a trustee's auction is vested with proper title during the period before the sale is later invalidated because it was not properly conducted. However, proper title is irrelevant to a claim of unlawful detainer because, lawful possession of property is the only issue to be determined in a claim for unlawful detainer.

We conclude that by virtue of the trustee's sale Cap Ski had a right to possess the property until the sale was invalidated on January 20, 1995. Cherokee has not proven that Cap Ski unlawfully held the property as against Cherokee because Cap Ski rightfully possessed the property.

We now examine what Cap Ski was vested with after the trustee's sale. Cap Ski possessed a trustee's deed and took as a bona fide purchaser without knowledge of any improper conduct by the trustee. During the period from November 1992 through January 1995, the sale had not been invalidated and Cap Ski had control of the property pursuant to the sale. Once the property reverted to Cherokee after the sale was deemed void, Cap Ski could no longer rightfully exercise control over the property.

Cherokee claims that it is entitled to recover for the damage to the lodge and ski resort property while in Cap Ski's possession. However, Mr. Pickrell testified that there had only been minimal damage to the property from November 1992 through January 1995 and that the substantial damage that did take place was committed after the sale was voided and the title reverted to Cherokee. Cherokee failed to submit any evidence to show that the damages complained of at trial were committed when Cap Ski lawfully possessed the property and failed to submit evidence to refute Mr. Pickrell's testimony. Mr. Pickrell's uncontradicted testimony was credible and must be taken as true. We must conclude that the damages occurred after it was decided that Cap Ski no longer rightfully possessed the property. As such, until the sale was invalidated, Cap Ski had a right to possess the property and to prevent anyone from trespassing on the land. Accordingly, the claim for unlawful detainer for the period of time that Cap Ski held the property after the foreclosure sale on November 30, 1992 until the sale was invalidated on January 20, 1995, is denied.

With respect to the time period after the sale was deemed void until the sale on

October 5, 1996, it is clear that Cap Ski did not have title or a right to possess the property. To support a cause of action for unlawful detainer for this period of time where Cap Ski knew it did not have lawful possession, Cherokee must prove that Cap Ski had possession of the property and prevented Cherokee from regaining possession.

It was established that Cap Ski exercised minimal control over the property simply to protect its interest. This control was in the form of the continuing employment of Mr. Pickrell to patrol the property, leaving the no trespassing signs posted, keeping the lodge doors and pump house door locked, and paying the taxes and insurance. There is no assertion or proof that this conduct is unlawful nor did it prevent individuals from entering the property.

In fact, Cherokee was never prevented from entering the property. Several people testified that a chain was erected across the roads at each entrance to the ski resort to obstruct entry onto the property after the sale in November 1992. This chain remained on the Lado Road that provides access to the property, and there were no trespassing signs posted on the property with the address of Cap Ski listed on the signs.[3] However, these steps clearly did not prevent Cherokee employees or witnesses for Cherokee at the various trials from entering and inspecting the property.

Five of Cherokee's witnesses at trial testified that they had each visited the property and were not denied access to the property by Cap Ski. Mr. Sennott stated that he had been on the property three times since the foreclosure sale; Mr. Ruffner testified that he had entered the property once to conduct an appraisal of the property; and both Mr. Smith and Mr. Lochner had visited the property twice since November 1992. Mr. Adkins, Cherokee's president, testified that upon the foreclosure sale being held on November 30, 1992 he vacated the premises, that he returned four or five times and was never prevented from going on the property. He further testified that he was aware that

Cap Ski had placed padlocks on the doors to the lodge and a chain and lock on the pump house door and chains across the access roads. Nevertheless, he was able to go onto the property, take pictures of both the outside and inside of the lodge and other areas of the ski resort without anyone interfering or directing him to leave.

At no point in time did Cherokee request possession or attempt to exercise any control over the property. Such conduct will not support a cause of action for unlawful detainer because, *inter alia*, there was no detention of the property from the owner. Accordingly, Cherokee's claim for unlawful detainer for both the time period that Cap Ski rightfully held the property and for the time period after the sale was voided is denied.

### 2. Unjust Enrichment

Cherokee is claiming that Cap Ski had the use, enjoyment and benefit of Cherokee's property without payment or reimbursement to Cherokee after November 30, 1992. As such, Cap Ski has been unjustly enriched for the use and enjoyment of Cherokee's property.

■ In order for Cherokee to prevail in the unjust enrichment action it must prove that (1) a benefit was conferred by Cherokee on Cap Ski; (2) Cap Ski knew of the conferring of the benefit; and (3) Cap Ski accepted or retained the benefit in circumstances that would render it inequitable for Cap Ski to have retained the benefit without paying for its value. *Nossen v. Hoy*, 750 F.Supp. 740, 744–45 (E.D.Va.1990); *see Provident Life & Accident Insurance Co. v. Waller*, 906 F.2d 985, 993 (4th Cir.), *cert. denied*, 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990).

■ Cap Ski argues no proof was adduced at the trial that would establish that Cap Ski ever derived any economic benefit from the property. Cherokee was in default on Cap Ski's deed of trust note from March 31, 1992 and had been in default on its obligations to the mechanic's lienors who were the principals of Cap Ski from mid–1990. From No-

**3.** A chain was also placed across the CCC Road and remained in place until sometime after July 1996.

vember 30, 1992, Cap Ski stated that in order to protect its interest, it expended money such as by paying the insurance and real estate taxes on the property. Because of these expenditures and the fact that Cap Ski never benefitted economically from the property, Cap Ski argues that the claim for unjust enrichment should be denied.

There is no indication that Cherokee conferred a benefit on Cap Ski that it would not be entitled to under the law. Clearly, from November 1992 through January 1995, Cap Ski had lawful possession of the property and would be entitled to benefit from possessing the property. From January 20, 1995 to present there was no evidence presented nor was it argued that Cap Ski actually benefitted from the property. Furthermore, we cannot conclude that it would be inequitable for Cap Ski to have retained any benefit that it may have received. As of July 1992, Cherokee was indebted to Cap Ski for over one million dollars and Cap Ski held a deed of trust and note on the property. In order to protect this interest Cap Ski paid for insurance on the property and the real estate taxes that accrued. It also employed Mr. Pickrell to patrol the property at a salary of $1,000 per month. Payment of these expenses without any benefit, defeats Cap Ski's claim for unjust enrichment.

### 3. Tortious Interference with Prospective Business Advantages or Business Relationships

Cherokee argues that as a result of Cap Ski's wrongful foreclosure sale of the ski resort property, Cherokee's prospective business advantages and business relationships arising from the operation of the ski resort were disrupted. As such, Cherokee asserts that it was damaged in an amount of five million dollars ($5,000,000.00).

Cap Ski contends that the foreclosure sale that was declared void was the sole act alleged in the counterclaim to provide the factual basis for the business advantage alleged to have been lost. It is asserted that Cherokee did not provide documents in discovery or any evidence at trial that identify an act or a contract that formed the factual basis for the claim.

■ Courts have listed the elements of a prima facie case of tortious interference with prospective business advantages and relationships as (1) The existence of a valid business expectancy with a probability of a future economic profit; (2) Defendant's knowledge of the expectancy; (3) A reasonable certainty that absent the defendant's misconduct, the plaintiff would have realized the expectancy; and (4) Damage to the plaintiff. *Commercial Business Systems, Inc. v. Halifax,* 253 Va. 292, 302, 484 S.E.2d 892, 897 (1997) (quoting *Glass v. Glass,* 228 Va. 39, 321 S.E.2d 69 (1984)); *see Chaves v. Johnson,* 230 Va. 112, 335 S.E.2d 97 (1985).

■ In the case at bar, Cherokee has failed to prove any of the elements required for a prima facie case of tortious interference with business expectancy. It has not established that it had a valid expectation of business with a probability of a future economic profit. Mr. Adkins testified that in 1992, Cherokee did not have any money. It was also proven that there were no documents produced or offered at trial to support any claim that it would have earned a profit but for Cap Ski's conduct. Cherokee was not operating a business, was insolvent and did not prove that it had an ongoing or prospective business relationship. Therefore, we must conclude that Cherokee would no longer be able to conduct business or realize a profit in the future.

Second, Cherokee did not prove that Cap Ski knew of the business expectancy. In fact, the record is void of evidence that the business would have gone forward even if the sale had not been conducted.

Third, Cherokee did not establish that without Cap Ski's intentional misconduct, Cherokee would have realized its expectation. There were no actions taken by Cap Ski that were intentional and wrongful, Cap Ski merely exercised its right to conduct a foreclosure sale.

Finally, Cherokee did not prove that it incurred damages as a result of Cap Ski's misconduct. To establish this claim, the misconduct must be intentional and it must be proven with reasonable certainty that without the interference Cherokee would have

realized its expectation to continue with the business. Here, there is no indication that the plaintiff's business would continue or that Cap Ski's conduct interfered with Cherokee's business. Further, Cap Ski's conduct of going forward with a foreclosure sale and taking control of the property was not improper nor was it intended to interfere with the plaintiff's business. Accordingly, the claim for tortious interference with a prospective business advantage or business relationship should be denied.

## CONCLUSION

Cherokee's claims for damages resulting from unlawful detainer, unjust enrichment and tortious interference with prospective business advantage/ tortious and intentional interference with business relationships and for punitive damages are hereby denied. A separate order will be entered consistent with this opinion.