Present:  All the Justices

COMMERCIAL BUSINESS SYSTEMS,INC.
                              OPINION BY JUSTICE A. CHRISTIAN COMPTON
v.  Record No. 960754                      April 18, 1997

HALIFAX CORPORATION, ET AL.

            FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                  Theodore J. Markow, Judge Designate


     This is the final chapter in litigation that has continued
most of this decade.  The moving party in the controversy is a
disgruntled player in the rough-and-tumble world comprising the
competitive marketplace.

     The main players in this dispute are:  Commercial Business
Systems, Inc. (CBS), a business located in Chesterfield County
that engaged in the repair, maintenance, and refurbishing of
computer and data processing equipment; BellSouth Services,
Incorporated, a business located in Birmingham, Alabama, that was
created to perform selected staff and planning functions for
Southern Bell and South Central Bell Telephone Companies and to
consolidate services that can be managed most effectively through
a central organization; Halifax Corporation, formerly Halifax
Engineering, Inc., a Virginia corporation located in Alexandria
that engaged in business similar to that of CBS; and Jerry H.
Waldrop, an Alabama resident who had been employed by BellSouth
in its Birmingham office as a contract officer responsible for
negotiating contracts with vendors and selecting vendors to
repair telephone and computer equipment for BellSouth.

     In 1990, CBS filed a motion for judgment against BellSouth
seeking recovery of lost profits and punitive damages for alleged

statutory conspiracy to injure CBS in its trade or business, in violation of Code § 18.2-499; common law conspiracy to injure CBS's business; and tort liability imputed to BellSouth under the doctrine of respondeat superior as a result of the activities of Waldrop. CBS claimed that Waldrop awarded a contract to CBS's competitor, Halifax, in exchange for commercial bribes.

Following discovery, the trial court granted BellSouth's motion for summary judgment and denied CBS's motion for partial summary judgment. CBS contended that, as a matter of law, Waldrop acted within the scope of his employment with BellSouth when he engaged in improper conduct.

On appeal, this Court reversed the trial court's judgment and remanded the case for further proceedings. Commercial Business Systems v. BellSouth Services, Inc., 249 Va. 39, 453 S.E.2d 261 (1995). The record in that appeal was comprised of the pleadings, including memoranda and exhibits accompanying the summary judgment motions, "selected" responses to requests for admission, and "excerpts" from deposition testimony of a number of witnesses.

In that appeal (hereinafter, the BellSouth case), we held that a jury issue was presented on the question whether Waldrop acted within the scope of his employment when he committed the wrongful acts, and thus the trial court erred in granting summary judgment in favor of BellSouth on CBS's tort liability claim. Id. at 46, 453 S.E.2d at 266. We also held that the trial court

erred in granting summary judgment on CBS's claims of statutory conspiracy, common law conspiracy, and damages.

Upon remand, the BellSouth case was consolidated with another action that had been filed by CBS. Prior to the BellSouth appeal and after the trial court had ruled on the summary judgment motions in favor of BellSouth, CBS nonsuited other defendants in that case. Then, CBS refiled an action against some of the parties who had been defendants at the pleading stage of the BellSouth case. After the cases were joined upon remand, CBS filed a consolidated motion for judgment against defendants BellSouth, Halifax, Waldrop, and Clifford J. McGuire, who had been Halifax's southeastern regional manager.

The consolidated cases were tried to a jury during eight days in October 1995. The issues submitted to the jury were CBS's claims against all defendants of statutory conspiracy, common law conspiracy, and conspiracy to tortiously interfere with a prospective business relationship. Also submitted was CBS's claim against Halifax and McGuire of wrongful interference with a prospective business relationship.

The jury found in favor of all defendants on the statutory and common law conspiracy claims. The jury found in favor of BellSouth and Halifax, and against Waldrop and McGuire, on the claim of conspiracy to tortiously interfere with a prospective business relationship. The jury found against Halifax and McGuire on the claim of wrongful interference with a prospective

business relationship.  The jury awarded CBS compensatory damages of $435,177 plus prejudgment interest.

Subsequently, the trial court entered judgment on the verdict in favor of BellSouth.  Later, the court set aside the verdict against Halifax, McGuire, and Waldrop and entered judgment in their favor, from which CBS appeals.  The judgment in favor of BellSouth has become final.  Waldrop, who appeared pro se throughout the proceedings, has not appeared on appeal.

The dispositive issue on appeal is whether CBS presented evidence sufficient to raise a jury question on its claim that Halifax and/or McGuire (hereinafter, Halifax) wrongfully interfered with CBS's prospective business relationship with BellSouth in connection with a contract that CBS had with BellSouth that expired July 28, 1987.

When the verdict of a jury has been set aside by the trial court, the verdict is not entitled to the same weight upon appellate review as one that has received the trial court's approval.  But in considering the facts under these circumstances, the appellate court will accord the plaintiff benefit of all substantial conflicts in the evidence and all reasonable inferences that may be drawn from the evidence.  Kelly v. Virginia Elec. and Power Co., 238 Va. 32, 34, 381 S.E.2d 219, 220 (1989).

Before we summarize the evidence, we shall dispose of a contention made by CBS that somehow Halifax is bound in the

present appeal by factual conclusions stated by this Court in the former appeal in the BellSouth case to which Halifax was not a party. At various times on brief and during oral argument of the appeal, CBS has packaged this contention in terms of "controlling precedent" or "stare decisis" or "persuasive," although not "the law of the case" or "res judicata." Whatever may be the actual basis of this contention, we reject it.

Of course, under the doctrine of stare decisis, the principles of law as applicable to the state of facts in the BellSouth case will be adhered to, and will apply in later cases where the facts are substantially the same, even though the parties are different. See Selected Risks Ins. Co. v. Dean, 233 Va. 260, 265, 355 S.E.2d 579, 581 (1987). But adherence to that principle relating to conclusions of law does not mean that conclusions of fact based on a summary judgment record have any binding effect whatsoever, in the context of appellate review, upon factual findings arising from a jury trial where the parties in the two cases are different and where, unlike the summary judgment proceeding, the facts were fully developed.

Indeed, a reason underlying our Rule 3:18, providing that summary judgment "shall not be entered if any material fact is genuinely in dispute," is to assure that parties' rights are determined upon a full development of the facts, not just upon pleadings and "selected" "excerpts" from discovery materials. Thus, it would be illogical to hold, in this context, that

appellate conclusions of fact in a summary judgment appeal have any controlling effect upon facts later developed in the case during a jury trial.  See Carper v. Norfolk & W. R. Co., 95 Va. 43, 45, 27 S.E. 813, 813 (1897) (upon remand for trial de novo, new decision required upon second appellate review if facts change).

The material facts presented during the jury trial essentially are undisputed.  CBS was founded by Gary Ewell Lacey as a sole proprietorship "around 1981" to repair, refurbish, and sell telecommunications equipment.  Incorporated in 1984, CBS "would approach companies," including telephone companies, "and see if they needed communications equipment either purchased or refurbished or repaired."  Lacey contacted BellSouth seeking to obtain a contract for the repair of Digital Equipment Corporation (DEC) "writer printers" known as "TP1000s," which were manufactured for and extensively used by telephone companies.

Lacey dealt with William B. Jordan, a BellSouth employee whose duties involved writing "contracts for the repair of movable telecommunications equipment."  Jordan also was responsible for "contract administration," that is, his "job was to assure that the contract was being met by both the vendor and the company."

In 1985, CBS submitted a bid of $691,060 and was awarded Contract No. 85073 for "The Repair/Refurbishment and Conversion of TP1000 Teleprinters" for "the two year period July 29, 1985

thru July 28, 1987."  The contract did not "grant [CBS] an exclusive privilege to repair all products of the type described" and provided that BellSouth "may contract with others for the repair of comparable products and services."  The contract also provided for termination by either party upon 60 days notice "without any charge or liability whatsoever."

CBS commenced performing under the contract and "had an excellent working relationship" with Jordan, who solely administered the contract.  In November 1986, because the "contract was coming up for renewal," Lacey contacted Jordan and advised him that CBS "would like to start the process to renew the contract with BellSouth."  According to Lacey, when Jordan was asked "what he thought [CBS's] chances of renewal were," Jordan responded, "that's not going to be a problem . . . you guys are one of the best vendors that we have . . . . You're doing your work, performing like you're supposed to and you [are] also the incumbent."

In February 1987, Jordan changed job responsibilities and ceased being the administrator of the contract.  Jordan's duties with reference to the contract were assumed by Waldrop.  Waldrop also became BellSouth's contracting officer responsible for negotiating equipment repair contracts with vendors upon expiration of such contracts.

In early 1987, CBS unsuccessfully attempted by both telephone and letter to reach Waldrop to discuss renewal and

expansion of its contract.  Finally, Waldrop responded by telephone.  When Lacey "tried to talk to him about renewal," Waldrop "suggested" that CBS was "having very serious financial trouble" and that CBS was "having warranty problems with equipment being returned back not being repaired satisfactorily." CBS undertook an investigation of Waldrop's charges and concluded that Waldrop's information was "totally unfounded."  On June 4, 1987, CBS advised Waldrop by letter of this finding.

On June 15, 1987, Waldrop wrote Lacey expressing appreciation for CBS's "recent letter" and the "information regarding your current financial status and the recent problems your company has encountered."  Waldrop wrote:  "I hope you can continue to make your comeback."

"However," the letter continued, "as I discussed with you over the telephone, our plans are not to renew the contract with your company at this time.  BellSouth Services strives to offer our clients the best in quality and service that the `market' has to bear.  This can be achieved by opening that market to other qualified vendors and encouraging competition for the services we desire."  BellSouth, through Waldrop, refused to allow CBS to bid "or even be part of the competition" for a new contract, and the expired contract was not renewed.

In the meantime, during 1985-86, McGuire, as Halifax's "southeastern regional manager," was "supposed to drum up business" for his employer.  At that time, McGuire began "seeking

business with BellSouth through Jerry Waldrop."  This effort was successful, and Halifax started "doing work" for BellSouth "that involved some printer repairs."  Later, in "middle '86," Halifax "began doing some additional work for BellSouth," which included "TP1000 work."

In June 1987, Halifax submitted a written proposal to BellSouth "seeking to do the TP1000 work."  Prior to that time, Halifax was receiving TP1000 printers from BellSouth for repair without any written contract.  McGuire, called by CBS as an adverse witness, testified he had no knowledge of CBS's existence in June 1987.

In June, July, and August of 1987, Halifax began getting "more and more" TP1000s from BellSouth for repair.  Subsequently, BellSouth awarded Halifax a written contract for "The Repair/Refurbishment of DEC Printers, Keyboards and Terminals" for the term "January 1, 1988 through December 31, 1989."

In July 1989, following negotiations between McGuire and Waldrop, Halifax's contract was amended by a written agreement, which extended the term of the initial agreement six months to June 30, 1990.  This amendment allowed Halifax "to get a higher price" for the work it was performing.

During the period when Halifax was dealing with Waldrop, Halifax began obtaining various items and services directly from companies in which Waldrop had a personal interest.  For example, an owner's manual, which Halifax had to purchase from the

equipment manufacturer, accompanied each repaired TP1000. Halifax began saving some of the cost of the manuals by purchasing them directly from a company named Entracom, which was owned by Waldrop. He had manuals privately copied in Birmingham, and Entracom sold the reproduced manuals to Halifax at a large markup over the copying cost.

In addition, Halifax had an agreement with Waldrop that Entracom would perform "all the shipping" of repaired items for Halifax and that Halifax would purchase all its "supplies" from Entracom. During the period October-December 1987, "boxes" and "pallets" containing items repaired by Halifax were being shipped by a company named MedSouth, Incorporated, in rented trucks. The trucks were driven by either Waldrop or one of his relatives. Waldrop's brother was executive vice-president and general manager of MedSouth. Later, the shipping was performed by Entracom using leased trucks driven by Waldrop family members. The family members were compensated for their services to MedSouth and Entracom.

Also, Halifax paid Entracom $6,000 per month in 1988 as rent for office and warehouse space in Birmingham. Entracom paid $620 per month to lease the space.

In 1989, Waldrop was discharged because he had been involved in conflicts of interest while employed by BellSouth. In a response to a CBS request for admission, BellSouth admitted that the "windfall profit from Entracom's sale of supplies to Halifax

was a kickback or bribe" to Waldrop for contract amendments and "was intended to induce him to send more business to Halifax." The trial court instructed the jury that this admission was binding on BellSouth only and was not to be considered as evidence against Halifax or Waldrop.

The analysis must begin with the question whether CBS presented any credible evidence that would permit a jury to find, without speculating, that Halifax committed the tort of wrongful interference with prospective business or economic advantage. For without proof of the underlying tort, there can be no conspiracy to commit the tort.

In Glass v. Glass, 228 Va. 39, 51, 321 S.E.2d 69, 76–77 (1984), this Court recognized such a tort. We summarized the elements of the cause of action as follows: "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." Id. at 51–52, 321 S.E.2d at 77.

The foregoing elements were embodied in Instruction No. 27 in the present case, given without objection by any party. The trial court told the jury that CBS had the burden to prove by a preponderance of the evidence that: "(1) there was a business relationship or expectancy between CBS and BellSouth Services,

with a reasonable probability of future economic benefit to CBS; (2) Halifax and/or McGuire knew about this business expectancy or relationship; (3) in the absence of Halifax and/or McGuire's intentional misconduct, it is reasonably certain that CBS would have continued in the relationship or realized the expectancy; and (4) such misconduct proximately caused damage to CBS."

In a written opinion granting the motion to set the verdict aside, the trial court assumed without deciding that there was a business expectancy between CBS and BellSouth, that there was intentional misconduct, and that CBS sustained damages. The court ruled that there was evidence from which the jury could have found Halifax and McGuire knew of the existence of CBS and that CBS had a contract with BellSouth for the repair of TP1000 printers. But the court also ruled there was no evidence Halifax "had any knowledge of any expectancy that the contract would continue, for how long, or that it was subject to renewal or that Halifax was in any way prevented from competing with CBS for that business because of the CBS expectancy."

Importantly, the trial court also concluded the evidence failed to establish the first element of the cause of action, namely, that CBS had a reasonable probability the contract would be renewed, or the third element, namely, that it was reasonably certain "CBS would have realized the expectancy but for the misconduct of Waldrop and Halifax/McGuire." Thus, we shall focus on those two elements.

Initially, we shall comment on several obvious principles that apply to the tort of wrongful interference with a prospective business or economic advantage. First, proof of the existence of the first and third elements of the tort must meet an objective test; proof of subjective expectations will not suffice. In other words, mere proof of a plaintiff's belief and hope that a business relationship will continue is inadequate to sustain the cause of action.

Second, the proof must establish a "probability" of future economic benefit to a plaintiff. Proof of a "possibility" that such benefit will accrue is insufficient.

We have searched this voluminous record, which includes a 2,998-page appendix, in an effort to find credible evidence upon which a jury could properly base a finding that, at the time the contract was about to expire, CBS had a reasonable probability the contract would be renewed or CBS would have realized any such expectancy but for the misconduct of Halifax. The record is utterly devoid of such evidence.

It is true that CBS was encouraged by Jordan's November 1986 comments about the prospects for renewal. Subjectively, during the period when the contract was about to expire, CBS's principals thought CBS was performing well under the contract and they had a subjective expectation that it would be renewed.

However, CBS failed to present credible evidence that either Jordan, if he had continued to administer the contract, or

Waldrop, when he took over as contract administrator, would probably have renewed the contract.

During his deposition testimony presented as part of CBS's case, Jordan stated it would be "hard to say at this juncture" whether he would have continued to do business with CBS if he had remained contract administrator. This testimony was consistent with Jordan's live testimony when called later in the trial as BellSouth's witness. Jordan stated he never told Lacey that "CBS could expect to be renewed."

Jordan was replaced by Waldrop in February 1987. The evidence is uncontradicted that Waldrop was the BellSouth employee who would decide whether CBS would continue in a relationship with BellSouth after the July 1987 expiration of the TP1000 contract. The undisputed evidence showed that under no circumstances, and for reasons totally unrelated to any intent to profit on his own, would Waldrop have renewed the contract.

CBS was experiencing problems that made it a tarnished participant in the competition among many vendors for BellSouth's work. For example, while the contract was in effect, CBS's "costs got kind of out of hand" and it "had some cash flow problems," according to the testimony of Thomas Michael Clayton, CBS's president at the time of trial. CBS's outside accountants reported to it on February 27, 1987 that "the corporation incurred a net loss of $264,810 during the year ended October 31, 1986 and, as of that date, the corporation's current liabilities

exceeded its current assets by $173,471 and its total liabilities exceeded its total assets by $106,918." According to the accountant, "These factors indicate that the corporation may be unable to continue in existence." CBS failed to report this information to BellSouth. Also, CBS failed to submit monthly reports regularly about its "accountability," as required by the contract.

In early 1987, CBS closed an office in Columbia, South Carolina, and consolidated its operations in the Richmond area in an effort to cut costs. This removed its presence and "depot location" from near the Florida-Alabama area; BellSouth did not want its equipment "setting up there in Virginia" for repair because it was "trying to get vendors that were close" to Birmingham. During this period, CBS was unable to make federal tax payments in a timely fashion.

BellSouth was aware of all these circumstances, which played a part in the decision not to renew. And, during this period BellSouth was doing business with another vendor, Halifax, a prerogative BellSouth could exercise under the terms of the nonexclusive CBS-BellSouth contract.

Finally, contrary to CBS's contention, there was no credible evidence of any BellSouth "standard practice" or "preference" for continuing to work with incumbent vendors. CBS's contention is based on a portion of the testimony of Christopher Jones, a Halifax executive called by CBS as an adverse witness. Jones was

asked by CBS's attorney whether Waldrop "once" told him "that once you get working with BellSouth if you do a good job you have a contract with us forever."  Jones answered, "I recall seeing that."  When asked whether Waldrop "said it to you," Jones responded, "I don't recall.  I recall hearing it, I don't recall who he said it to . . . I recall hearing it, I don't know who said it."  Testimony about a comment from an unidentified source regarding an unidentified time period is insufficient to establish a corporate policy of renewing incumbent vendors.

In sum, we hold CBS established merely a subjective belief or hope that the business relationship would continue and merely a possibility that future economic benefit would accrue to it. And, conflicts of interest existing in the BellSouth-Halifax relationship cannot be converted into a business expectancy for CBS.

Thus, it follows that the trial court did not err in setting aside the verdict in favor of CBS for its failure to prove the cause of action.  This conclusion makes it unnecessary to address the remaining issues in the appeal.

Therefore, the judgment from which the appeal was awarded will be

Affirmed.