**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 05-2138**

_____

SOUTHPRINT, INCORPORATED, d/b/a Checkered Flag
Sports,

Plaintiff - Appellant,

versus

H3, INCORPORATED,

Defendant - Appellee.

_____

Appeal from the United States District Court for the Western
District of Virginia, at Danville. Norman K. Moon, District Judge.
(CA-02-38-4)

_____

Argued: September 20, 2006            Decided: December 7, 2006

_____

Before MOTZ and GREGORY, Circuit Judges, and Richard L. VOORHEES,
United States District Judge for the Western District of North
Carolina, sitting by designation.

_____

Affirmed by unpublished opinion. Judge Gregory wrote the opinion,
in which Judge Motz and Judge Voorhees joined.

_____

**ARGUED:** Harold David Gibson, GENTRY, LOCKE, RAKES & MOORE, Roanoke,
Virginia, for Appellant. Luke Anderson, MERCHANT & GOULD, L.L.C.,
Atlanta, Georgia, for Appellee. **ON BRIEF:** William R. Rakes, Monica
Taylor Monday, GENTRY, LOCKE, RAKES & MOORE, Roanoke, Virginia, for
Appellant. Brian C. Riopelle, Kristen M. Calleja, MCGUIREWOODS,
L.L.P., Richmond, Virginia, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Southprint, Inc. ("Southprint") appeals the dismissal on motion for summary judgment of its state-law causes of action against H3, Inc. ("H3"). Because we agree with the district court that H3 is entitled to judgment as a matter of law, we affirm.

## I.

In August of 2001, the prominent national auto retailer AutoZone began contemplating a chain-wide program that would promote hats bearing Ford, Chevy, and Dodge logos in its stores. Only H3 and Southprint (doing business as Checkered Flag Sports) were considered as possible vendors for the program. In the early months of 2002, both vendors participated in extensive test programs with AutoZone, designed to ascertain which vendor would best serve AutoZone's needs. On April 18, 2002, Southprint submitted a bid to AutoZone for the Ford, Chevy, and Dodge program. H3 submitted its quote eleven days later on April 29.

Earlier, on March 23, 2002, Raul Alvarez, acting on Southprint's behalf, wrote to DADA Corp. ("DADA"), hat manufacturer for both Southprint and H3, to ask for price quotes on hats DADA made exclusively for H3. H3 supplied the hats to its client, Roush Racing ("Roush"). E-mails Alvarez sent two and three days later indicate that he received the pricing information from DADA and

that Southprint was, at that time, considering using that information to capture Roush's business.

According to the uncontested affidavit of H3 president Scott Hines, on April 2, 2002, H3 asked DADA to enter into an exclusive relationship with H3 in order to protect H3's pricing information and hat designs, as well as to ensure a consistent source of hats. Alvarez recalled speaking with Stephen Park of DADA in March or April of 2002 about DADA's plans to cease doing business with Southprint. On April 17, DADA released a letter announcing that it had entered into an exclusive deal with H3. The letter stated that DADA would manufacture Ford, Chevy, and Dodge headwear only for H3 and that DADA would not accept any orders for these types of caps from other customers as of the date of the letter.

On May 9, 2002, Alvarez received an e-mail from Park of DADA saying that the following day Checkered Flag Sports should begin working with a company called Trademax instead of DADA. In his response to the e-mail, Alvarez asked Park twenty-four questions about Trademax and the prospective shift in manufacturers. Alvarez relied upon Park's answers to those questions and a phone conversation he had with Park when assuring Southpoint executives that Trademax was wholly owned by DADA's owners and would manufacture caps to DADA standards.

At roughly the same time, representatives of AutoZone called Southprint and H3 to inform them that AutoZone intended to give

Southprint the chain-wide contract.[1] Todd Hammett, a manufacturer's sales representative hired to co-represent Southprint to AutoZone, answered one such call from AutoZone on Southprint's behalf. Hammett stated that he did not consider the AutoZone call to be a commitment from AutoZone, although he did believe that Southprint would ultimately get AutoZone's business.

After receiving a similar call from AutoZone, Michael McGhee of H3 began to make phone calls to various AutoZone representatives. Testimony regarding the precise substance of McGhee's calls varies, but recipients of McGhee's calls testified that McGhee asked many questions about Southprint's financial stability, licensing agreements, and manufacturing capability. According to the AutoZone representatives deposed, McGhee's questions were standard ones typically raised by vendors in such circumstances. The Monday following AutoZone's calls to Southprint and H3, Marilyn Hurst of AutoZone was asked by her superiors to give Southprint and H3 another chance at the chain-wide contract. Although AutoZone representatives never fully explained their decision to reconsider the vendor for the Ford, Chevy, and Dodge program, the AutoZone buyers testified that McGhee's calls did not affect their decision.

---

[1] Both parties give May 10, 2002 as the date of these calls, but neither cites any spot in the record that pinpoints this date as the crucial one. The relevant witnesses remember the call being made on a Friday in May, but not on the tenth specifically.

On May 14 and 15, Southprint placed orders for hats with DADA, ostensibly in reliance upon the call from AutoZone. At some point on the fifteenth, Hurst contacted Hammett with inquiries arising from McGhee's calls. By that date, AutoZone had received a second bid from H3, a bid that would be parried by Southprint's second bid on May 30. The day after Southprint submitted its second bid, AutoZone notified the company that it had been selected as AutoZone's chain-wide vendor for the Ford, Chevy, and Dodge program.

On July 15, 2002, Southprint filed suit against H3 in the United States District Court for the Western District of Virginia. Southprint raised a claim under Section 43(a) of the Lanham Act and three Virginia state-law claims: business defamation, tortious interference with a contract, and tortious interference with a business expectancy. In response to H3's motion for summary judgment, the district court dismissed all Southprint's claims on September 8, 2005. Southprint now appeals the dismissal of its tortious interference and defamation claims.

II.

This Court reviews a decision granting or denying a motion for summary judgment de novo. See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment shall be granted when "there is no

6

genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To be genuine, the dispute must be over evidence that would allow a reasonable jury to return a verdict for the nonmoving party. See id. To prevail, the nonmoving party may not rest upon the "mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253 (1968)).

## III.

### A.

Southprint first appeals the district court's dismissal of its claim of tortious interference with Southprint's DADA purchase orders. Southprint contends that H3 interfered with two purchase orders, placed by Southprint with DADA on May 14 and 15, 2002, "by demanding that DADA stop producing hats for Southprint." (Appellant's Br. 27.) When H3 asked DADA to enter into an exclusive production arrangement in April of 2002, however, the purchase orders in question had not yet been placed. H3 could not,

7

therefore, have tortiously interfered with the Southprint/DADA contracts by asking DADA to enter into an exclusive manufacturing agreement.

To support a claim for tortious interference with a contract or business expectancy in Virginia, a plaintiff must show

> (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

Duggin v. Adams, 360 S.E.2d 832, 835 (Va. 1987) (quoting Chaves v. Johnson, 335 S.E.2d 97, 102 (Va. 1985)). Southprint's DADA purchase orders are dated May 14 and 15, 2002. DADA agreed to H3's proposal of an exclusive relationship no later than April 17, 2002. As the timing makes clear, H3's formation of an exclusive relationship with DADA cannot form the basis of a tortious interference claim because at the time H3 entered into the relationship, the contractual relationship between Southprint and DADA in question (the purchase orders) did not yet exist.

Southprint also seems to argue that a May 22, 2002, e-mail from Scott Hines of H3 to Park of DADA constituted the tortious interference of which Southprint complains. In that e-mail, Hines reiterated H3's desire to maintain an exclusive relationship with DADA and its intent to take its business elsewhere if DADA did not respect that relationship. Hines also wrote: "DADA is not obligated

8

to accept orders or produce for any customers. Even if you chose not to produce for H3 then there would be nothing we could do about it. We cannot force you to do business with us or can [sic] anyone else." (J.A. 66.) Hines did not, however, give any indication that he was aware of any existing contractual relationships between DADA and Southprint with which he and H3 might interfere.

Southprint contends that an e-mail from DADA to H3 sent the day before Hines's communication proves that H3 was aware of the purchase orders. That e-mail mentions existing orders only once, in the following fashion: "Even for alraedy [sic] placed order(Ford,Chevy [sic] & Dodge),please [sic] kindly switch ..t [sic] to the substitutive [sic] company." (J.A. 262.) This sentence hardly gives H3 notice of an existing contractual relationship between DADA and Southprint. Although it may have notified H3 that Southprint had submitted an order to DADA, it certainly did not advise H3 that two purchase orders existed and had been agreed to by both companies. Without knowledge of the existence of a contractual relationship with which to interfere, H3 could not have tortiously interfered with a contract. See Duggin, 360 S.E.2d at 835. The district court's dismissal of Southprint's claim of tortious interference with the purchase orders is therefore affirmed.

9

B.

Southprint next argues that H3 tortiously interfered with a business expectancy between Southprint and DADA by pressuring DADA into an exclusive relationship with H3. According to Southprint, H3's April 2002 ultimatum to DADA—enter into an exclusive manufacturing relationship with H3 or lose H3's sizeable business—was improper and actionable under Virginia law. But Southprint presents no evidence tending to establish a business expectancy between Southprint and DADA in April 2002. Consequently, its claim of tortious interference with that business expectancy fails.

To prove the existence of a business expectancy, a party must demonstrate an objective expectation of future business; "mere proof of a plaintiff's belief and hope that a business relationship will continue is inadequate to sustain the cause of action." Commercial Bus. Sys., Inc. v. Halifax Corp., 484 S.E.2d 892, 301 (Va. 1997). The plaintiff must establish "a probability of future economic benefit, not a mere possibility." Id. Southprint has not met this burden.

Southprint had done business with DADA in the past and did so again after April 2002. In April 2002, however, Southprint did not have reason to believe it had won the AutoZone contract, so it had no objectively reasonable ground to expect imminent, AutoZone-related business with DADA. Cf. RFE Indus., Inc. v. SPM Corp., 105

10

F.3d 923, 927 (4th Cir. 1997) (finding no valid business expectancy under Virginia law where a supplier's customers purchased goods on an "as needed" basis with no commitment to future purchases). Southprint did not even submit its bid to AutoZone until April 18, the day after DADA released a letter announcing its new, exclusive arrangement with H3. Indeed, Alvarez acknowledged that he had heard from DADA of its exclusive deal with H3 "long before [the] May 10 date" on which AutoZone representatives ostensibly called Southprint to notify the company it had won the chain-wide contract. (J.A. 499.) Similarly, Southprint presents no evidence that in April 2002 it was likely to secure Roush's business and rely upon DADA to meet Roush's demand. Without an existing business expectancy with which to interfere, H3 could not have committed tortious interference by asking DADA to enter into an exclusive relationship. See Duggin, 360 S.E.2d at 835. The dismissal of this claim is affirmed.

C.

Southprint also appeals the district court's dismissal of Southprint's claim alleging tortious interference with its business expectancy with AutoZone. H3 concedes the existence of a business expectancy between Southprint and AutoZone arising May 10, 2002, and there is no dispute that H3 knew of that expectancy as of the

11

Friday in May on which it arose. But Southprint's business expectancy did not evaporate; it was realized.

On May 31, 2002, one day after receiving Southprint's revised bid, AutoZone awarded Southprint the chain-wide contract. Southprint claims to have been damaged to the extent that its second bid was lower than its first, but never explains why its business expectancy with AutoZone perished when AutoZone asked for the second bid. Southprint did not negotiate the details of the chain-wide contract with AutoZone during the May 10 phone call. Its valid business expectancy did not extend to details not discussed at that time. What business it could reasonably expect—to serve as AutoZone's vendor for whatever term AutoZone had specified—it realized when AutoZone ultimately opted for Southprint. Without loss of the business expectancy, there is no tortious interference. Because Southprint never lost its business expectancy with AutoZone, the district court's decision is affirmed.


D.

Finally, Southprint appeals the district court's dismissal of its claim of business defamation. In its brief, Southprint focuses entirely upon statements allegedly made to AutoZone by McGhee, arguing that McGhee's comments cast doubt on Southprint's business capabilities. This doubt, Southprint asserts, caused AutoZone to ask for a second bid, to Southprint's detriment. The only

12

potentially objectionable statement made by McGhee for which Southprint presents any evidence, however, cannot be considered defamatory under the applicable Virginia law. The district court's order, therefore, is affirmed.[2]

In its complaint, Southprint broadly alleged that H3 made "false, misleading, and disparaging" statements about Southprint to Southprint's customers, and specifically claimed that McGhee told Hurst, AutoZone's buyer, "I know for a fact that they [Southprint] do not have a Ford, Chevy and Dodge license." (J.A. 17, 15.) In its brief on appeal, Southprint highlights other allegedly defamatory statements made by McGhee. In particular, Southprint points to the recollections that AutoZone employees William Hull and William Edwards have of conversations with McGhee. None of the incidents to

---

[2]Southprint's defamation claim should not, as H3 suggests, be dismissed for having been pleaded improperly. Like any other civil complaint in federal court not subject to heightened pleading requirements, a defamation complaint must only provide a "short and plain" statement of the claim that is sufficient to give the defendant fair notice of the nature of the claim and the grounds upon which it rests. See Hatfill v. N.Y. Times Co., 416 F.3d 320, 329 (4th Cir. 2005); see also Fed. R. Civ. P. 8(a)(2). Without citing any authority, H3 contends that Southprint's defamation action should be dismissed because the complaint did not specify that it would pursue a defamation per se claim. To state a claim for defamation per se, though, a plaintiff need only allege "a publication of false information concerning the plaintiff that tends to defame the plaintiff's reputation." Hatfill, 416 F.3d at 330. Count II of Southprint's complaint alleged that H3 knowingly made "false, misleading, and disparaging statements" that "defamed" Southprint and damaged its reputation in the industry. (J.A. 17.) This formulation is sufficient to state a defamation per se claim under the liberal, federal rules of pleading. See Hatfill, 416 F.3d at 329; Fed. R. Civ. P. 8(a)(2).

13

which Southprint points, however, suffice to defeat H3's motion for summary judgment on the defamation claim.

McGhee's alleged statement to Hurst about Southprint's licenses does not create a genuine issue of material fact because there is no evidence that McGhee actually made the statement. The only references to the statement outside Southprint's complaint are found in the depositions of McGhee and Hurst. Unsurprisingly, McGhee denies ever making the statement. Hurst denies ever hearing it. At this stage of the litigation, Southprint cannot prevail solely on the basis of its pleading but must present specific facts showing that there is a genuine issue for trial. See Anderson, 477 U.S. at 248-49. It has not done so here.

Hull's recollections are insufficient to support a defamation claim because he is unsure whether McGhee even made the statements that Hull attributed to him. Asked if McGhee ever "specifically questioned [Southprint's] sourcing capabilities," Hull said:

> I'm sure if we had that discussion, it would have been something like, coming from [McGhee]: . . . You know, I've heard or [Southprint's] been known to do-to make promises and not fulfill. That's such a common discussion that there's no doubt in my mind we headed down that path at one point in time or another.

(J.A. 198.) The format of his answer makes clear that Hull was not recalling the actual details of a specific conversation, but rather dramatizing the likely contours of a discussion he assumed, on the basis of his experience in these kinds of business deals, he must have had. Such testimony cannot support a defamation action. Cf.

14

Gov't Micro Res., Inc. v. Jackson, 624 S.E.2d 63, 69 (Va. 2006) (upholding a finding of defamation when two witnesses could not recall the exact words of the supposedly defamatory statement but other persons testified as to its content).

Edwards, for his part, was more certain that he spoke with McGhee about licenses but still a bit shaky on the details. He said of a conversation with McGhee: "I don't believe he ever said: They don't have licenses. I believe he questioned whether or not—I believe the way he put it was: I'm not aware that anybody else has the license and the ability to sell you the type of products that we're talking about." (J.A. 227.) McGhee's alleged statements to Edwards, even if made as Edwards believes they were, had no tendency to defame.

Whether or not "a statement is capable of having a defamatory meaning is a question of law to be decided by the court." Hatfill v. N.Y. Times Co., 416 F.3d 320, 330 (4th Cir. 2005) (citing Yeagle v. Collegiate Times, 497 S.E.2d 136, 138 (Va. 1998)). Although a speaker may not escape liability for defamation by couching defamatory statements in the language of opinion, see Hatfill, 416 F.3d at 333-43 & n.6, some statements made by commercial actors about other commercial actors will not be considered defamatory, even if false, see Chaves, 335 S.E.2d at 103. There are some falsifiable claims, "made by one competitor against another," that can only be considered a "relative statement of opinion, grounded

15

upon the speaker's obvious bias, and having no tendency to defame."
Id. McGhee's statements to Edwards are such claims. Like the other AutoZone representatives, Edwards testified that McGhee's questions were typical of vendors in this sort of situation, and that they did not affect his decisions regarding Southprint in any way. Even if it is true that McGhee said he was not aware anybody else had the licenses H3 possessed, and even if Southprint in fact had the licenses McGhee doubted it owned, McGhee's statements were not defamatory.

## IV.

For the foregoing reasons the decision of the district court is affirmed and Southprint's claims against H3 are dismissed.

AFFIRMED