COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges AtLee, Callins and Senior Judge Haley
Argued at Richmond, Virginia


NORFOLK DISTRICT ASSOCIATES, LLC

                                       MEMORANDUM OPINION[*] BY
v.       Record No. 0674-22-2          JUDGE RICHARD Y. ATLEE, JR.
                                          FEBRUARY 27, 2024

THE CITY OF NORFOLK, ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Bradley B. Cavedo, Judge

John C. Lynch (Jason E. Manning; Michael E. Lacy; Troutman
Pepper Hamilton Sanders LLP, on briefs), for appellant.

Ryan D. Frei (Travis C. Gunn; Alicia M. Penn; Joseph L. Wilson, II;
McGuireWoods LLP, on brief), for appellee the City of Norfolk.

Hugh M. Fain, III (Patricia Bugg Turner; Kasey L. Hoare; Spotts
Fain PC, on brief), for appellee Norfolk Redevelopment and
Housing Authority.

Gary A. Bryant (Brett A. Spain; Bethany J. Fogerty; Willcox &
Savage, PC, on brief), for appellee Bernard A. Pishko.


In June 2021, appellant Norfolk District Associates, LLC ("NDA") filed suit in the Circuit

Court for the City of Richmond against the City of Norfolk (the "City"), Norfolk Redevelopment

and Housing Authority ("NRHA"), and Norfolk City Attorney Bernard A. Pishko, in his individual

capacity (collectively "appellees"). NDA appeals the order of the circuit court sustaining appellees'

demurrers and dismissing NDA's complaint. On appeal, NDA argues that the circuit court erred in

sustaining the demurrers because NDA had alleged facts sufficient to sustain its claims and, at the

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

demurrer stage, the circuit court was bound to accept its interpretation of the lease agreement. For the following reasons, we disagree and affirm the decision of the circuit court.

## I. BACKGROUND

Because we are reviewing a decision to sustain a demurrer, "we accept as true all facts properly pleaded and all reasonable inferences that may be drawn from those facts." *Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 322 (2015).

In 2013, NDA and NRHA entered into a lease agreement. The City signed the lease "for the limited purpose of acknowledging its rights and guarantying its obligations" under certain sections of the lease. Under the agreement, NDA agreed to lease Waterside, a property in Norfolk, Virginia, from NRHA, which owns the property. It also agreed to develop and operate "an entertainment, retail, nightclub, bar and/or restaurant complex" on the land. NDA alleged that it agreed to develop Waterside in exchange for the City and NRHA giving NDA the exclusive right to develop and operate a casino in Norfolk if the General Assembly legalized casino gaming in Virginia.

NDA pointed to three provisions of the lease agreement that purportedly gave rise to this exclusive right, sections 8.1, 10.2.1, and 10.2.2. Section 8.1 provides, "As of the Effective Date, neither the City nor NRHA will subsidize or provide a performance based grant for a restaurant and entertainment development of over 75,000 square feet similar to the Project for a period of ten (10) years from the Effective Date." The effective date of the lease was October 31, 2013.

Section 10.2.1 provides,

> Lessee[1] shall have the right to develop and operate the Leased Premises for the Permitted Use. The Permitted Use includes the installation and operation of one or more Virginia Lottery terminals, but does not currently include the operation of the Premises as a casino or other gaming establishment, which is a use to which the City does not object but is a use that is not reflected

---

[1] "Lessee" refers to NDA, and "Lessor" refers to NRHA.

within the financial terms of this Lease Agreement. In the event
that the law of the Commonwealth of Virginia is changed to permit
the possibility of developing and operating all or part of the
Premises as a casino or other gaming establishment, at the request
of Lessee, Lessor and Lessee shall enter an amendment to this
Lease Agreement if terms including but not limited to agreeing to a
modified rent reasonably satisfactory to Lessee and Lessor, both
parties acting reasonably, are agreed upon. Moreover, at the
request of Lessee, Lessor and the City shall cooperate with Lessee
in obtaining any Government Approvals necessary to enable the
Premise to be utilized as casino or other gaming establishment.

Section 10.2.2 provides, in part, "Lessor and the City will cooperate with and support Lessee in modifying, as necessary in Lessee's sole discretion, or complying with Virginia law to authorize the Permitted Use with regard to Lessee and its Subtenants." After signing the lease agreement, NDA developed, and currently operates, the Waterside project.

In December 2018, the City[2] announced it had entered an exclusive deal with the Pamunkey Tribe for the Tribe to develop and operate a casino if Virginia law changed to allow casino gaming. Pishko, as city attorney, was personally involved in negotiating the deal. Among other things, NDA alleged that Pishko "exceeded the power of his office and authority" and that he was acting to "execute his personal agenda against ND[A]." NDA also alleged that in support of the Tribe's casino deal, the City hired a lobby group to persuade the General Assembly to amend the law to allow casino gaming.

---

[2] NDA's complaint makes allegations against both the City and NRHA. But NRHA is mentioned only in a conclusory fashion when grouped together with all defendants collectively. The allegedly improper acts in the complaint are actions of the City or Pishko, not NRHA. The attached exhibits show action only on the part of the City. NRHA was not a party to the negotiations with the Tribe, nor were they a signatory to those agreements. NDA has not alleged any wrongful action on the part of NRHA, and it has only included NRHA in a conclusory fashion. "[W]e are not bound to accept conclusory allegations in review of a demurrer." *Ogunde v. Prison Health Servs., Inc.*, 274 Va. 55, 66 (2007); *see also Patterson v. City of Danville*, 301 Va. 181, 197 (2022) ("[W]hile we also accept as true unstated inferences to the extent that they are *reasonable*, we give them no weight to the extent that they are *unreasonable*.").

In January 2020, NDA learned that gaming legislation was being considered by the General Assembly. NDA reached out to the City and NRHA to discuss amending the lease and developing a casino at Waterside. It also learned of the City's agreement with the Tribe. NDA informed the City and NRHA of the alleged breach and requested a meeting. According to NDA, the City and NRHA ignored its requests and denied any obligation to locate a casino at Waterside.

In 2020, the General Assembly enacted a law to permit casino gaming in Virginia. *See* Code § 58.1-4101. But there were limitations. Code § 58.1-4110(H) provides, "No portion of any facility developed with the assistance of any grants or loans provided by a redevelopment and housing authority created pursuant to § 36-4[3] shall be used as a casino gaming establishment." Thus, Code § 58.1-4110(H) appears to prohibit the use of Waterside for casino gaming, as it is owned by NRHA, a redevelopment and housing authority. NDA claims this limitation was a result of the City "conspir[ing] to amend the legislation during a 'closed door session.'"

In June 2021, NDA filed suit against the appellees. The complaint included multiple counts. NDA alleged that the City and NRHA breached sections 8.1 and 10.2.1 of the agreement by, among other things, dealing with the Tribe and by refusing to cooperate with NDA in obtaining the approvals necessary to operate a casino. It also argued that Pishko's dealings with the Tribe constituted both tortious interference with a contract and tortious interference with a business expectancy. Based on Pishko's tortious interference, NDA alleged that appellees committed both statutory business conspiracy and common law conspiracy.

All three appellees demurred, and the circuit court sustained the demurrers. It held that the language of section 10.2.1 was an unenforceable agreement to agree, and therefore the City

---

[3] Code § 36-4 concerns the creation of redevelopment and housing authorities.

and NRHA had no casino-related obligations towards NDA.  Additionally, it found that each of

NDA's claims turned on the existence of a contractual obligation.  Because section 10.2.1 did not

create an obligation, the circuit court concluded that each of the other claims failed.  NDA now

appeals.

## II. ANALYSIS

NDA argues on appeal that the circuit court erred in sustaining the demurrers.  All of NDA's

assignments of error, and the underlying claims, turn on the premise that the City and NRHA

breached enforceable contractual obligations owed to NDA under the lease agreement.[4]  Because

---

[4] NDA argues that its allegations of statutory business conspiracy and common law conspiracy do not depend on the existence of a contract.  Rather, it contends that the claim for "tortious interference with business expectancy constitutes the requisite 'unlawful' act to support a claim for either common law or business conspiracy."  A claim for tortious interference with a business expectancy can be the wrongful act to support conspiracy claims.  *See Theologis v. Weiler*, 76 Va. App. 596, 610 (2023) ("[A]ctions for common law civil conspiracy and statutory business conspiracy lie only if a plaintiff sustains damages as a result of an act that is itself wrong or tortious." (alteration in original) (quoting *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 215 (2014))).  Those claims fail, however, because NDA's claim of tortious interference with a business expectancy also fails.  Here, NDA pled that "NDA had a valid business expectancy with the City and NRHA *under the Lease Agreement*."  (Emphasis added.)  Thus, NDA specifically based its tortious interference of a business expectancy claim on the existence of obligations under the lease agreement.

Furthermore, even if we view the claim as based upon a "prospective business or economic advantage," NDA's claim still fails.  *See Duggin v. Adams*, 234 Va. 221, 227 (1987).  To present a prima facie case based on a prospective interest, the plaintiff must allege not only an intentional interference but also that the defendant used improper methods to interfere.  *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 559 (2011).  "Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules."  *Id.* (quoting *Duggin*, 234 Va. at 227).  It may also include things such as violence, threats or intimidation, fraud, misrepresentation or deceit, or similar acts.  *Id.*  The Supreme Court, however, has refused "to extend the scope of the tort to include actions solely motivated by spite, ill will and malice."  *Id.* at 560.  NDA's allegations against Pishko largely fall within this latter category, including allegations Pishko acted "to advance his personal agenda," believed he was the "real Mayor," and that he "target[ed] ND[A] and Cordish with malicious intent to harm."

Additionally, tortious interference with a business expectancy requires, among other things, proof of "the existence of a business relationship or expectancy, *with a probability of future economic benefit to plaintiff*."  *Com. Bus. Sys. v. Halifax Corp.*, 253 Va. 292, 300 (1997) (emphasis added) (quoting *Glass v. Glass*, 228 Va. 39, 51 (1984)).  A "subjective belief or hope that the business relationship would continue and [a] mere[] . . . possibility that future economic

we find that section 10.2.1 was an unenforceable agreement to agree and a casino was not a permitted use under the terms of the agreement, we find that the circuit court did not err in sustaining the demurrers.

"In reviewing a circuit court's decision sustaining a demurrer, we address the same issue that the circuit court addressed: whether the facts alleged in a complaint are legally sufficient to state a cause of action upon which the requested relief may be granted." *Ramos*, 289 Va. at 322. "All reasonable factual inferences fairly and justly drawn from the facts alleged must be considered in aid of the pleading." *Dodge v. Trs. of Randolph-Macon Woman's Coll.*, 276 Va. 1, 5 (2008) (quoting *Fox v. Custis*, 236 Va. 69, 71 (1988)). A demurrer, however, "does not admit the correctness of the pleader's conclusions of law." *Id.* (quoting *Fox*, 236 Va. at 71). Further, when considering a demurrer, a circuit court is permitted to "ignore a party's factual allegations contradicted by the terms of authentic, unambiguous documents that properly are a part of the pleadings." *Id.* (quoting *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 382 (1997)). "Because this presents an issue of law, we review the circuit court's decision de novo." *Ramos*, 289 Va. at 322.

Whether the circuit court properly sustained the demurrers turns on two questions: (1) whether the City and NRHA had any enforceable casino-related obligations to NDA under section 10.2.1, and (2) whether casino gaming is a "Permitted Use" under the lease. Because the

---

benefit would accrue" is not sufficient. *Id.* at 301, 303. Every expectation related to the casino was conditional—on the law changing and, if it did, on the parties being able to negotiate an agreement acceptable to all. There are no allegations in the complaint suggesting the economic benefit was anything other than a possibility. Even now, the law still has not changed to allow a casino at Waterside.

answer to both those questions is no, NDA did not sufficiently allege a breach of section 8.1 or section 10.2.1.[5]

A. *The City and NRHA did not have an enforceable casino-related obligation under section 10.2.1 because it was an unenforceable agreement to agree.*

To have an enforceable contract, "[t]here must be mutual assent of the contracting parties to terms reasonably certain under the circumstances." *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 345 (2016) (quoting *Allen v. Aetna Cas. & Sur. Co.*, 222 Va. 361, 364 (1981)). Agreements to agree in the future are "too vague and indefinite to be enforced." *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 254 Va. 514, 519 (1997) (quoting *Allen*, 222 Va. at 364). Thus, it is "well settled under Virginia law that agreements to negotiate at some point in the future are unenforceable."[6] *Navar*, 291 Va. at 346 (quoting *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 490 (E.D. Va. 2002)). Even an agreement to "negotiate open issues in good faith" will be considered an "agreement to agree rather than a valid contract." *Id.* at 346-47

---

[5] On appeal, NDA also argues that the City and NRHA breached section 10.2.2 of the lease agreement. NDA raised its breach of contract claims in Count I of the complaint, and it specifically pled a breach of section 8.1, section 10.2.1, and a failure to act in good faith. It did not mention section 10.2.2. Thus, a breach of section 10.2.2 was not pled in the complaint, and we consider section 10.2.2 only insofar as it informs our interpretation of the contract. *See Schuiling v. Harris*, 286 Va. 187, 193 (2013) ("We construe the contract as a whole . . . .").

[6] *See also Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 403 (2012) (characterizing an agreement that gives a party the opportunity to receive work from a second party but does not obligate the second party to provide work as an "agreement to agree"); *Kay v. Pro. Realty Corp.*, 222 Va. 348, 350-51 (1981) (finding that an agreement requiring an agent and a realtor to "negotiate a settlement" at the time of termination if a termination occurred was "nothing more than an agreement to agree upon a settlement at a later date"); *Allen*, 222 Va. at 364 (finding that there must be "mutual assent of the contracting parties to terms reasonably certain under the circumstances in order to have an enforceable contract" and that "[a] court should not determine the terms of the settlement upon which the parties might ultimately agree"); *Virostko v. Virostko*, 59 Va. App. 816, 825 (2012) (finding that a provision providing "the parties will . . . agree upon a new amount [of child support] based on father's income" was merely an agreement to agree because there were "no objective standards by which the parties could determine a new amount").

(quoting *Va. Power Energy Mktg., Inc. v. EQT Energy*, LLC, No. 3:11cv630, 2012 WL 2905110, at *7 (E.D. Va. July 16, 2012)).

In *Navar*, the parties entered into an agreement that provided that if appellant was "awarded a prime contract then it would negotiate in good faith with [appellees] and, 'upon arriving at prices, terms and conditions acceptable to the parties,' enter into subcontracts." 291 Va. at 342. The Supreme Court noted that the agreement did "not contain a sum, or any reasonably certain method for determining a sum, or any requirement that [the parties] mutually agree[] that [appellees] would be the actual subcontractors hired by [appellant] once the prime contract was awarded." *Id.* at 347. It noted that there were no definite terms, and it was "merely an agreement to agree to negotiate at a future date" and thus it was not an enforceable contract. *Id.*

Here, section 10.2.1 provides, in relevant part,

> In the event that the law of the Commonwealth of Virginia is changed to permit the possibility of developing and operating all or part of the Premises as a casino or other gaming establishment, at the request of Lessee, Lessor and Lessee shall enter an amendment to this Lease Agreement if terms including but not limited to agreeing to a modified rent reasonably satisfactory to Lessee and Lessor, both parties acting reasonably, are agreed upon.

Like the provision in *Navar*, the provision here does not contain sufficiently definite terms. The agreement does not set out a modified rent, nor does it set out a "reasonably certain method" for determining an appropriate modified rent. *Navar*, 291 Va. at 347. Although the provision says the parties "shall" enter a lease amendment, the remaining language conditions any lease amendment upon the parties coming to an agreement on terms, including but not limited to rent. By its very nature, an agreement to negotiate shows that the parties have not assented to reasonably certain terms of a contract, and many prospective deals go off the rails

- 8 -

during negotiations.  Section 10.2.1 was simply an agreement to negotiate at a future date.[7]

Thus, section 10.2.1 is an unenforceable agreement to agree.

B. *A casino is not a "Permitted Use" under the lease.*

NDA argues that the City breached section 8.1.  It also argues that if sections 8.1, 10.2.1, and 10.2.2 are read together, the City and NRHA were required to use Waterside for any casino if the law changed to allow casino gaming.  Both arguments turn on whether a casino is a "Permitted Use" under the lease.  Because the lease specifically and expressly excludes a casino as a permitted use, we find that the lease did not obligate the City and NRHA to use Waterside for a casino if the law changed.

Section 8.1 provides, "As of the Effective Date, neither the City nor NRHA will subsidize or provide a performance based grant for a restaurant and entertainment development of over 75,000 square feet similar to the Project for a period of ten (10) years from the Effective Date."[8]  On appeal, NDA argues that the Tribe's proposed casino development is "similar to" the Waterside project because it includes a casino.  NDA argues that "the parties intended the 'Permitted Use' of Waterside would include casino gaming," and it relies on a string of

---

[7] Additionally, the lease specifically states that the provision is implicated, "[i]n the event that the law of the Commonwealth of Virginia is changed to permit the possibility of developing and operating all or part of the Premises as a casino or other gaming establishment . . . ."  While the General Assembly amended the law to allow casinos, it specifically excluded doing so with the assistance of a redevelopment or housing authority—such as NRHA.  *See* Code § 58.1-4110(H) ("No portion of any facility developed with the assistance of any grants or loans provided by a redevelopment and housing authority created pursuant to § 36-4 shall be used as a casino gaming establishment.").  Thus, the current law of Virginia does not allow operating the premises as a casino.

[8] NDA claims that section 8.1 grants it an exclusive right to develop and operate a casino in Norfolk.  But the language only promises the City and NHRA will not "subsidize or provide a performance based grant" to a "similar" project.  Thus, the contract simply does not provide NDA with an exclusive right to operate a casino.  Because NDA alleges that the City optioned land for sale to the Tribe at a fraction of its fair market value and agreed to give subsidies in lieu of real estate tax assessments, we address whether the Tribe's proposed development was "similar to" Waterside.

definitions, included in the lease, from which we should infer that a casino was a permitted use.[9]

NDA contends that the circuit court was bound by its interpretation at the demurrer stage of the proceedings. Although we normally accept as true all properly pled facts at the demurrer stage, we are not required to accept any conclusions of law. *Dodge*, 276 Va. at 5. Further, a circuit court is permitted to "ignore a party's factual allegations contradicted by the terms of authentic, unambiguous documents that properly are a part of the pleadings." *Id.* (quoting *Ward's Equip., Inc.*, 254 Va. at 382).

Here, the unambiguous terms of the lease contradict NDA's interpretation of the lease agreement. The lease defines "Permitted Use" as "the use of the Leased Premises for one or more nightclubs, bars, restaurants, food courts, retail stores and/or entertainment venues similar to one or more of the Urban Properties, together with related and ancillary and/or complementary uses, such as a management and leasing office." Section 10.2.1 adds additional detail, providing "[t]he Permitted Use includes the installation and operation of one or more Virginia Lottery terminals, *but does not currently include the operation of the Premises as a casino or other gaming establishment*." (Emphasis added.) Thus, the express terms of the agreement specifically exclude a casino from the definition of "Permitted Use." To further emphasize that a

---

[9] NDA points us first to the definition of "Project," which under the lease

> means a real estate development to be located on and at the Leased Premises at least equal in quality to the Urban Properties, taking into account that the Development consists of a renovation and retrofit of an existing structure (i.e., Waterside), into an entertainment, retail, nightclub, bar and/or restaurant complex for the Permitted Use that is similar in quality to the Urban Properties.

From there it points to the definition of "Urban Properties," which "mean[s] the Live! branded properties that affiliates of the Lessee currently operate and maintain located in the States of Maryland, Pennsylvania, Missouri, and Texas and the Commonwealth of Kentucky, as same m[a]y evolve." Because the Live! branded properties in Maryland and Pennsylvania include commercial casinos, NDA argues that a casino was intended as a permitted use.

casino does not fall within the "Permitted Use," section 10.2.1 states that use of the premises as a casino "is a use that is not reflected within the financial terms of this Lease Agreement."

NDA did not even attempt to explain or harmonize these provisions in section 10.2.1 with its interpretation of "Permitted Use." Although we are required to read a contract as a whole and harmonize provisions where possible, we are also "bound to say that the parties intended what the written instrument plainly declares." *Schuiling v. Harris*, 286 Va. 187, 192 (2013) (quoting *Wilson v. Holyfield*, 227 Va. 184, 187 (1984)). If a reasonable meaning can be given, we will not treat any words or clauses in a contract as meaningless. *Orthopaedic & Spine Ctr. v. Muller Martini Mfg. Corp.*, 61 Va. App. 482, 491 (2013). The agreement here plainly declares that a casino is not a permitted use under its terms, and we will not treat that provision as meaningless. We are not bound to accept NDA's interpretation of a contract, even at the demurrer stage, where the contract expressly contradicts that interpretation. *Dodge*, 276 Va. at 5. Because NDA's argument that the Tribe's proposed development is "similar to" the Waterside project turns on whether casino gambling is a permitted use, and because "Permitted Use" does not include the use of the premises as a casino, the exclusivity provision in section 8.1 does not grant NDA an exclusive right to develop and operate a casino in Norfolk.

NDA's arguments relating to section 10.2.2 fail for the same reason.[10] Section 10.2.2 provides that the City and NRHA "will cooperate with and support [NDA] in modifying, as

---

[10] NDA also argues that section 10.2.1 requires NRHA and the City to "cooperate with [NDA] in obtaining any Government Approvals necessary to enable the Premise to be utilized as [a] casino or other gaming establishment." The agreement, however, defines "Government Approvals" as "all licenses, permits, approvals, consents or other relief required of or deemed necessary or appropriate in [NDA]'s sole discretion for its use of the Leased Premises for the *Permitted Use (as such term is defined herein)* . . . ." (Emphasis added.) Because it is limited to the permitted use, it suggests the provision in 10.2.1 comes into effect only if the law changes to allow casino gaming and the parties agree to terms for a modified lease. This would then require the City and NRHA to cooperate with NDA to obtain any permits, licenses, etc., necessary to operate a casino.

necessary in [NDA]'s sole discretion, or complying with Virginia law to authorize the Permitted Use with regard to [NDA] and its Subtenants." It also states that the City and NRHA "shall take no action[] which would adversely affect [NDA]'s ability to use the Leased Premises for the Permitted Use." Both provisions refer specifically to the "Permitted Use," which, as explained above, expressly does not include operating a casino. Accordingly, reading section 8.1 and 10.2.2 together with section 10.2.1 does not place an obligation on the City and NRHA to use NDA to develop a casino. Because all of NDA's claims rely on such an obligation, the circuit court did not err in sustaining appellees' demurrers.

### III. CONCLUSION

For the foregoing reasons, we affirm the decision of the circuit court.

*Affirmed.*